*Hearing Date:   To Be Set by the Court After*
*Decision by District Court on*
*Motion under 28 USC §157(d)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
                                                               :
In re:                                                         :
                                                               :        Chapter 11
AMES DEPARTMENT STORES, INC., *et al.*,                        :        Case No. 01-42217 (REG)
                                                               :
                                             *Debtors.*        :        Jointly Administered
-------------------------------------------------------------- x
                                                               :
AMES DEPARTMENT STORES, INC.,                                  :        Adversary Proceeding
                                             *Plaintiff,*      :        No. 06-01890 (REG)
          – against –                                          :
                                                               :
LUMBERMENS MUTUAL CASUALTY                                     :
COMPANY,                                                       :
                                             *Defendant.*      :
-------------------------------------------------------------- x

## DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO AMES' JURISDICTION MOTION (ECF #64)
## AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION TO DISMISS OR STAY
## THIS ADVERSARY PROCEEDING UNDER THE McCARRAN-FERGUSON ACT

**TORRE, LENTZ, GAMELL, GARY**
**& RITTMASTER, LLP**
*Attorneys for Defendant*
100 Jericho Quadrangle, Suite 309
Jericho, New York  11753
Tel.: (516) 240-8900
          Mark S. Gamell, Esq.
          Robert Beau Leonard, Esq.

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT .................................................................................................1

FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

       Lumbermens' Surety Bond On Behalf of Ames,
       Travelers' Claim, And The Lumbermens/Travelers Settlement ....................................2

Travelers' Demand on Lumbermens' Bond Was Improper ................................................3

       A.      Travelers' Demand Was Improper On Its Face ...........................................3

       B.      The Back-Dated Agreements Between Ames
               And Travelers Were Not Covered..............................................................5

       C.      Travelers' Demand Violated The Terms of Its Agreement With Ames...................6

Ames Never Asserted Any Position Regarding
The Travelers/Lumbermens Dispute...............................................................................8

The Adversary Proceeding, Ames' Settlement With Travelers,
And Ames' 2009 Amendment of the Adversary Complaint..............................................11

The December 2008 Settlement Order.............................................................................11

Ames Has No Interest in the Trust Monies.......................................................................13

The Order Of Rehabilitation And Subsequent Proceedings
In The Bankruptcy Court Leading To This Motion............................................................15

The Lumbermans Rehabilitation Estate...........................................................................16

POINT I

The Mccarran-Ferguson Act Mandates That This Adversary Proceeding Be
Stayed Or Dismissed, As The Illinois State Rehabilitation Proceedings Pre-
Empt The Bankruptcy Court And Divest It Of Jurisdiction Over This Dispute..........................16

POINT II

Ames' Jurisdictional Arguments Are Without Merit..........................................................21

       A.      The Bankruptcy Court Does Not Have Exclusive Jurisdiction ..........................22

The 2007 and 2008 Motion Proceedings Did Not
Involve Jurisdictional Findings As To The Trust Funds…………………………………………23

The Legal Authorities Cited by Ames For The Alleged "Exclusive
Jurisdiction" Of The Bankruptcy Court Do Not Support Its Arguments…………………………26

Ames' Arguments Based Upon An Alleged Violation Of The Automatic
Stay Do Not Support Exclusive Jurisdiction In The Bankruptcy Court…………………………...29

The Trust Monies Are Not "Property Of The Estate" Of Ames…………………………………30

Neither Ames' Adversary Complaint Nor Its Prior Motions
Asserted That The Trust Monies Were Property of the Estate…………………………………...31

POINT III

Ames' Arguments Regarding the "Letter Agreement" Are Without Merit……………………...33

    A.    The Letter Agreement Is A Valid Exercise By
          Two Creditors Of Rights Granted to Them By Ames………………………………33

    B.    The Letter Agreement Is Not "Void," But Even
          If It Were No Trust Monies Would Flow To Ames……………………….............33

    C.    Ames Was Not Damaged By The Letter Agreement…………………………34

    D.    The Letter Agreement Did Not Grant The Court Power To Rewrite
          Its Terms Or Those Of The Trust Agreement For Ames' Benefit…………………35

    E.    Lumbermens' Rights Of Equitable Subrogration Would Have Yielded
          The Same Result to The Estate In the Absence of the Letter Agreement……………36

POINT IV

Ames' Second Amended Complaint Has No Merit
And Its Claims Are Based Upon State Law…………………………………………………………39

POINT V

Ames' Other Jurisdictional Arguments Are Without Merit………………………………………44

CONCLUSION…………………………………………………………………………………...45

## TABLE OF AUTHORITIES

Cases ..................................................................................................................... Page

*19 Perry St., L.L.C. v. Unionville Water Co.*, 294 Conn. 611, 987 A.2d 1009 (2010) ................... 41

*Adv. Cellular Sys. v. Mayol* (*In re Adv. Cellular Sys.*), 235 B.R. 713 (Bankr. D.P.R. 1999) ...... 1, 18

*Air Liquide America Corp. v. Continental Casualty Co. v. CIGNA Property & Casualty Co., 217 F.3d* (10th Cir. 2000) ................................................................................. 29

*Allied Mut. Ins. Co. v. Heiken*, 675 N.W.2d 820 (Iowa 2004) ........................................ 38

*Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc.* (*In re Andrew Velez Constr., Inc.*), 373 B.R. 262 (Bankr. S.D.N.Y. 2007) ....................................... 27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................. 42

*Ashland Petrol. Co. v. Appel* (*In re B & L Oil Co.*), 782 F.2d 155 (10th Cir. 1986) ................... 42

*Auto Glass Exp., Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 975 A.2d 1266 (2009) ...................... 41

*Balboa Ins. Co. v. Bank of Boston Conn.*, 702 F. Supp. 34 (D. Conn. 1988) ............................. 37

*Banque Nationale de Paris S.A. v. Ins. Co. of N. Am.*, 896 F. Supp. 163 (S.D.N.Y. 1995) ........... 33

*Beitler v. Rudkin*, 104 Conn. 404 (1926) ................................................................. 41

*Berks Behavioral Health, L.L.C. v. St. Joseph Reg'l Health Network* (*In re Berks Behavioral Health, L.L.C.*), 464 B.R. 684 (Bankr. E.D. Pa. 2012) ................................ 27

*Big Idea Liquidating Creditor Trust v. Safeco Ins. Co. of Am.* (*In re Big Idea Prods.*), 372 B.R. 388 (Bankr. N.D. Ill. 2007) ................................................................. 38

*Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356 (2006) ...................................................... 27

*Chem. Bank v. Meltzer*, 93 N.Y.2d 296 (1999) ............................................................. 40

*Chester v. Leonard*, 68 Conn. 495, 37 A. 397 (1897) ...................................................... 41

*Cincinnati Ins. Co. v. Torok*, 787 N.E.2d 1257 (Ohio Ct. App. 2003) ..................................... 29

*Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 19-21 (1995) ............................................. 40

*Colmmerz Union Austalt v. Collectors' Guild, Ltd.*, 147 B.R. 317 (S.D.N.Y. 1992) ................... 30

*Craft v. Isham*, 13 Conn. 28 (1838) ........................................................................ 41

*Crow & Sutton Assocs. v. C.R. Klewin Northeast, LLC*, 2010 Conn. Super. LEXIS 1197 (Conn. Super. Ct. May 21 2010) ................................................................. 41

*De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 849 A.2d 382 (2004) .......................................................................................... 41

*Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993) ......................................................... 17

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136 (2d Cir. 2005) ....................................... 43

*Duplitronics, Inc. v. Concept Design Elecs. & Mfg.* (*In re Duplitronics, Inc.*), 183 B.R. 1010 (Bankr. N.D. Ill. 1995) ................................................................. 30

*Elm Haven Const. LP v. Neri Const.*, 376 F.3d 96 (2d Cir. 2004) ......................................... 41

*First Ave. W. Bldg., L.L.C. v. James (In re Onecast Media)*, 439 F.3d 558 (9th Cir. 2006) .......... 28

*Flagship Hotel, Ltd. v. City of Galveston (In re Flagship Hotel, Ltd.)*, 2007 Bankr. LEXIS 550 (Bankr. S.D. Tex. Feb. 16, 2007) ............................................................. 27

*G.C. Murphy Co. v. Reserve Ins. Co.*, 54 N.Y.2d 69 (1981) ............................................. 17

*Galey & Lord Inc. v. Arley Corp. (In re Arlco, Inc.)*, 239 B.R. 261 (S.D.N.Y. 1999) ................ 43

*Gen. Accident Ins. Co. of Am. v. Merritt-Meridian Constr. Corp*, 975 F. Supp. 511 (S.D.N.Y. 1997) ..................................................................................... 33

*Greenwich Ins. Co. v. Greenwich St. Capital Partners II, L.P. (In re Metro Affiliates, Inc.)*, 2008 Bankr. LEXIS 752 (Bankr. S.D.N.Y. Mar. 6, 2008) ........................... 41

*Hassett v. BancOhio Nat'l Bank (In re CIS Corp.)*, 172 B.R. 748 (S.D.N.Y. 1994) ............... 27

*Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines)*, 198 B.R. 45 (S.D.N.Y. 1996) ......................................................... 27, 32, 49

*Humana Inc. v. Forsyth*, 525 U.S. 299 (1999) ........................................................ 16

*Hutton Constr. Co. v. Cnty. of Rockland*, 52 F.3d 1191 (2d Cir. 1995) ........................... 33

*Indiana Lumbermens Mut. Ins. Co. v. Rusty Jones, Inc., (In re Rusty Jones, Inc.)*, 124 B.R. 774 (Bankr. N.D.Ill. 1991) ......................................................... 20

*In re Coney Island Land Co., LLC*, 2005 Bankr. LEXIS 2909 (Bankr. E.D.N.Y. Mar. 31, 2005) ......................................................... 42

*In re Agway, Inc.*, 357 B.R. 195 (Bankr. N.D.N.Y. 2006) ........................................ 20

*In re Charter Co.*, 913 F.2d 1575 (11th Cir. 1990) ................................................ 27

*In re Chateaugay Corp.*, 116 B.R. 887 (Bankr. S.D.N.Y. 1990) ................................... 28

*In re Dominguez*, 312 B.R. 499 (Bankr. S.D.N.Y. 2004) ......................................... 19

*In re Ionosphere Clubs, Inc.*, 124 B.R. 635 (S.D.N.Y. 1991) .................................... 30

*In re Lyondell Chem. Co.*, 416 B.R. 108 (Bankr. S.D.N.Y. 2009) ............................... 41

*In re MF Global Holdings Ltd.*, 469 B.R. 177 (Bankr. S.D.N.Y. 2012) ....................... 1, 17

*In re Med. Care Mgmt. Co.*, 361 B.R. 863 (Bankr. M.D. Tenn. 2003) ....................... 1, 18

*In re Ollag Constr. Equip. Corp.*, 578 F.2d 904 (2d Cir. 1978) ................................. 38

*In re Smart World Techs., L.L.C.*, 423 F.3d 166 (2d Cir. 2005) ................................. 43

*In re Wetzler*, 192 B.R. 109 (1996) ................................................................. 38

*In re Wingspread Corp.*, 116 B.R. 915 (S.D.N.Y. 1990) ......................................... 37

*In re Wingspread Corp.*, 145 B.R. 784 (S.D.N.Y. 1992) ......................................... 37

*In re Yonikus*, 996 F.2d 866 (7th Cir. 1993) ...................................................... 29

*In re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. 427 (Bankr. S.D.N.Y. 1982) ............... 42

*Int'l Fin. Corp. v. Kaiser Group Int'l Inc. (In re Kaiser Group Int'l Inc.)*, 399 F.3d 558 (3d Cir. 2005) ..................................................................................... 28

*John's Insulation v. Hartford Accident & Indem. Co. (In re John's Insulation)*, 221 B.R. 683 (Bankr. E.D.N.Y. 1998) ...................................................... 39

*Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.)*, 162 B.R. 935 (Bankr. S.D.N.Y. 1994) ......... 30

*Kraken Inv. Ltd. v. Jacobs (In re Salander-O'Reilly Galleries, L.L.C.)*, 475 B.R. 9
(S.D.N.Y. July 9, 2012) ......................................................................................... 26

*Logan v. Credit Gen. Ins. Co. (In re PRS Ins. Group, Inc.)*, 294 B.R. 609
(Bankr. D. Del. 2003) ........................................................................................ 1, 17

*Logan v. Credit Gen. Ins. Co. (In re PRS Ins. Group, Inc.)*, 335 B.R. 77
(Bankr. D. Del. 2005) ............................................................................................ 19

*Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, 304 F.3d 223
(2d Cir. 2002) ....................................................................................................... 23

*MBNA Am. Bank v. Hill*, 436 F.3d 104 (2d Cir. 2006) ....................................................... 30

*Malinowski v. N.Y. State DOL (In re Malinowski)*, 156 F.3d 131 (2d Cir. 1998) ....................... 42

*Mar. Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*, 920 F.2d 183
(2d Cir. 1990) ....................................................................................................... 42

*Mata v. Eclipse Aerospace, Inc. (In re AE Liquidation, Inc.)*, 435 B.R. 894 (Bankr. D. Del. 2010) ... 26

*Matter of Holford*, 896 F.2d 176 (5th Cir. 1990) .............................................................. 42

*Matter of Rimsat, Ltd.*, 98 F.3d 956 (7th Cir. 1996) ......................................................... 27

*McRaith v. Am. Re-Insurance Co., 2010 U.S. Dist. LEXIS* (N.D. Ill. Feb. 17 2010) ..................... 29

*Meyer v. United States*, 375 U.S. 233 (1963) ................................................................. 43

*Menorah Nursing Home, Inc. v. Zukov*, 153 A.D.2d 13, 548 N.Y.S.2d 702 (2d Dep't 1989) ........ 38

*Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436 (2d Cir. 2005) ..................................... 23

*N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93 (2d Cir. 1997) .......... 42

*Nationwide Mut. Ins. Co. v. R & S Assoc., 1992 Conn. Super. LEXIS*
(Conn. Super. Ct. Sept. 18 1992) ............................................................................ 37

*Nat'l Union Fire Ins. Co. v. FDIC*, 887 F. Supp. 262 (D. Kan. 1995) ..................................... 38

*New Eng. Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart
Convenience Stores, Inc.)*, 351 F.3d 86 (2d Cir. 2003) ................................................ 43

*Newbery Corp. v. Fireman's Fund Ins. Co. (In re Newbery Corp.)*, 95 F.3d 1392
(9th Cir. 1996) ..................................................................................................... 42

*Official Comm. of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*,
2006 U.S. Dist. LEXIS 45510, 2006 WL 1751793 (D.N.J. June 21, 2006) ....................... 17

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
4 F.3d 1095 (2d Cir. 1993) ..................................................................................... 27

*PSE Consulting, Inc. v. Frank Mercede & Sons*, 267 Conn. 279, 838 A.2d 135,
2004 Conn. LEXIS 5 (2004) ............................................................................... 33, 41

*Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962) ........................................................ 37

*Penthouse Media Group v. Guccione (In re Gen. Media, Inc.)*, 335 B.R. 66
(Bankr. S.D.N.Y. 2005) .......................................................................................... 27

*Peoples State Bank v. GE Capital Corp. (In re Ark-La-Tex Timber Co.)*, 482 F.3d 319
(5th Cir. 2007) ..................................................................................................... 43

*Pep'e v. McCarthy*, 249 A.D.2d 286, 287, 672 N.Y.S.2d 350 (2d Dep't 1998) ...................... 37, 38

*Putnam Cnty. Sav. Bank v. Bagen (In re Bagen)*, 185 B.R. 691 (Bankr. S.D.N.Y. 1995) ............ 30

*Rachman Bag v. Liberty Mut. Ins. Co.*, 46 F.3d 230 (2d Cir. 1995) ................................................ 41

*Rafool v. GMAC (In re Goulding)*, 2003 Bankr. LEXIS 1126 (Bankr. C.D. Ill. Sept. 10, 2003) ... 27

*S.S. Silberblatt, Inc. v. Seaboard Sur. Co.*, 417 F.2d 1043 (8th Cir. 1969) ................................... 41

*Savage & Assocs. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 134 (Bankr. S.D.N.Y. 2005) ............ 27

*Stern v. Marshall*, 564 U.S. 2, 131 S. Ct. 2594 (2011) ................................................................. 22

*Strong v. W. United Life Assur. Co.*, 2011 U.S. Dist. LEXIS (D.Utah Jan. 19 2011) .................... 23

*Strong v. W. United Life Ass. Co. (In re Tri-Valley Distr., Inc.)*, 350 B.R. 628,
   2006 WL 2583247 (2006) ........................................................................................................ 23

*Strong v. W. United Life Assur. Co. (In re Tri-Valley Distrib.)*, 533 F.3d 1209
   (10th Cir. 2008) ......................................................................................................................... 23

*Sutton v. Hay*, 9 F.2d 795 (7th Cir. 1925) .................................................................................... 30

*Syracuse Eng'g Co. v. Haight*, 97 F.2d 573 (2d Cir. 1938) .......................................................... 38

*Transmontaigne Prod. Servs. v. M/V Wilbur R. Clark, supra, 2010 U.S. Dist. LEXIS*
   (S.D. Ala. Mar. 29 2010) .......................................................................................................... 43

*Travelers Cas. & Sur. Co. of Am. v. Caridi, 2012 Conn. Super. LEXIS*
   (Conn. Super. Ct. Apr. 19 2012) ......................................................................................... 33, 41

*United States v. Inslaw, Inc.*, 932 F.2d 1467 (D.C. Cir. 1991) ..................................................... 27

*United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983) ........................................................... 28

*Vertex, Inc. v. Waterbury*, 278 Conn. 557, 898 A.2d 178 (2006) ............................................... 41

*Voiland v. Tipsword (In re Troy Jenn Inc.)*, 2006 Bankr. LEXIS 1632
   (Bankr. N.D. Ill. June 30, 2006) ............................................................................................... 21

*Vt. Toy Works, Inc. v. Sebert Lumber Co. (In re Vt. Toy Works, Inc.)*, 135 B.R. 762
   (D.Vt. 1991) .............................................................................................................................. 43

*Wagner v. Amwest Ins. Group*, 285 B.R. 447 (Bankr. C.D. Cal. 2002) ................................... 1, 18

*Zhang v. Omnipoint Communs. Enters.*, 272 Conn. 627 (2005) .................................................... 5

## Statutes

11 U.S.C. § 105 (2006) .................................................................................................................. 13

11 U.S.C. § 109 (2006) .................................................................................................................. 18

11 U.S.C. § 365(c)(1)(B)(2) (2006) ............................................................................................... 40

11 U.S.C. § 509(a) (2006) .............................................................................................................. 37

11 U.S.C. § 542 (2006) .................................................................................................................. 31

15 U.S.C. §§ 1011–1015 (2006) .................................................................................................. 1, 16

15 U.S.C. § 1012 (2006) .............................................................................................................. 1, 16

215 Ill. Comp. Stat. 5/189, /191, /192 ......................................................................................... 16

215 Ill. Comp. Stat. 5/221(1) ............................................................ 17

28 U.S.C. § 157(b)(2)(G) (2006) ...................................................... 30

28 U.S.C. § 1334 (2006) .................................................................. 22

28 U.S.C. § 1334(b) (2006) ........................................................ 22, 27

28 U.S.C. § 1334(c)(1) (2006) ......................................................... 23

28 U.S.C. § 1334(e) (2006) ...................................................... 21, 30, 31

Conn. Gen. Stat. § 38a-905(19) ...................................................... 17

Conn. Gen. Stat. § 52-550(3) ........................................................... 5

N.Y. Gen. Oblig. Law § 5-701(a) .................................................... 5

N.Y. Ins. Law § 7408(b)(6) .............................................................. 17

Other Authorities

63 *N.Y.Jur.2d, Guaranty & Suretyship* (1987) ................................... 40

### PRELIMINARY STATEMENT

Andrew Boron, Director of Insurance of the State of Illinois, as statutory and court affirmed Receiver of Lumbermens Mutual Casualty Company, in Rehabilitation ("the Rehabilitator" or "Defendant"), opposes the motion of Plaintiff Ames ("Ames' Jurisdiction Motion") for a declaration of Bankruptcy Court jurisdiction over this dispute and over $8 million in Lumbermens' assets currently held in Trust by the Bank of New York, as Trustee (the "Trust Monies"). The Ames bankruptcy estate has never had, and does not now have, any property interest or right in the Trust Monies, and the Bankruptcy Court has never exercised jurisdiction over those funds. Ames' arguments are based upon *ipse dixit* and mischaracterizations of the governing documents. Ames has nothing more than a disputed, general unsecured claim against Lumbermens' insolvent rehabilitation estate which may be collected, if at all, only in the Illinois rehabilitation court. Ames' motion must be denied.

In addition, the Rehabilitator cross-moves to stay or dismiss this Adversary Proceeding in deference to the Illinois state court rehabilitation proceedings commenced against Lumbermens by the Rehabilitator, as required by the McCarran-Ferguson Act (15 U.S.C. §§ 1011–1015 (2006)). All the reported decisions which have considered circumstances similar to those presented by this dispute have ruled that McCarran-Ferguson requires the federal courts to stand down, in favor of the state court rehabilitation proceedings commenced by the statutory receiver of the insolvent insurance company,[1] either by staying its own proceedings or by acknowledging that whatever jurisdiction it had possessed had been pre-empted by the State insurance regulator's proceedings by virtue of McCarran-Ferguson. Plaintiff Ames has not cited a single decision in which a court ruled to the contrary under circumstances similar to these.

In the event the Court determines that the U.S. District Court or the Bankruptcy Court does

---

[1] *See Logan v. Credit Gen. Ins. Co.* (*In re PRS Ins. Group, Inc.*), 294 B.R. 609 (Bankr. D. Del. 2003), *aff'd; In re MF Global Holdings Ltd.*, 469 B.R. 177 (Bankr. S.D.N.Y. 2012); *In re Med. Care Mgmt. Co.*, 361 B.R. 863 (Bankr. M.D. Tenn. 2003); *Wagner v. Amwest Ins. Group*, 285 B.R. 447 (Bankr. C.D. Cal. 2002); *Adv. Cellular Sys. v. Mayol* (*In re Adv. Cellular Sys.*), 235 B.R. 713 (Bankr. D.P.R. 1999).

possess jurisdiction and should continue these proceedings, then this Adversary Proceeding should be tried in the District Court (and the Bankruptcy Court's reference withdrawn), in light of 28 U.S.C. §157(d) and/or the constitutional limits of the powers of a non-Article III judge.[2]

## FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

Lumbermens' Surety Bond On Behalf of Ames,
Travelers' Claim, And The Lumbermens/Travelers Settlement

A surety bond in the amount of $14.35 million was issued on November 1, 2000 by Lumbermens, as surety, and Ames, as principal, and in favor of Travelers Indemnity Company (Travelers), as obligee (the "Bond," Gamell Aff. Ex. A).[3]  The Bond stated, among other things, that "The Principal [*i.e.*, Ames] shall not at any time have any rights or property interests in this Bond, the Bond Collateral or other proceeds of this Bond."

In connection with the issuance of the Bond, Ames executed a General Agreement of Indemnity dated July 26, 2000, executed September 26, 2000 (the "Indemnity Agreement," Gamell Aff. Ex. B). The Indemnity Agreement stated, among other things, that Lumbermens, as surety, had the exclusive right to determine how claims against its Bonds should be "compromised, resisted, defended, tried or appealed," and the surety's decision was agreed to be "final and binding upon the Indemnitors" (*see* Indemnity Agreement, paragraph "5", "Surety's Rights Re: Claims").

Approximately ten months after the Bond had been issued, Ames filed its petition for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York, on August 20, 2001.

On May 21, 2003, Travelers sent Lumbermens a demand for payment of the entire penal sum of the Bond (the "Demand Letter", Gamell Aff. Ex. C).  Two weeks later, following some written

---

[2] The Rehabilitator has separately moved for mandatory withdrawal of the reference to the Bankruptcy Court under 28 U.S.C. §157(d)  and Bankruptcy Rule 5011 (*see* U.S.D.C., S.D.N.Y. 12-CV-08365-ALC ).  At the direction of the Bankruptcy Court, Ames' Jurisdiction Motion and the Rehabilitator's cross-motion are being briefed prior to the determination of the Rehabilitator's §157(d) motion for withdrawal of the reference.

[3] References to "Gamell Aff." refer to the accompanying affidavit of Mark S. Gamell sworn to December 27, 2012.

communications regarding Travelers' demand between Lumbermens and Travelers, Travelers

commenced an action in the United States District Court for the District of Connecticut against

Lumbermens, seeking recovery of the Bond's full penal sum of $14.35 million (the "Connecticut

Lawsuit") on June 4, 2003,  (Gamell Aff. Ex. D).

On November 4, 2003, Travelers and Lumbermens executed a letter agreement that resolved the

Travelers Connecticut Lawsuit (the "Letter Agreement," Gamell Aff. Ex. E).  Among the terms of the

Letter Agreement was Lumbermens' agreement to place $8 million into a Trust Account for the sole

benefit of Travelers, to be held by The Bank of New York, as Trustee.  The Letter Agreement further

provided that Travelers would first apply the two letters of credit that Ames had posted with Travelers as

collateral for Ames' obligations to Travelers, before Travelers would look to the Trust Monies or to the

remaining Bond penal sum, to pay Ames' obligations.  The Trust Agreement required by the Letter

Agreement was signed by Lumbermens, Travelers and the Bank of New York, and the trust was

thereafter funded by Lumbermens with the $8 million deposit that had been agreed to between Travelers

and Lumbermens (see "Trust Agreement," Gamell Aff. Ex. F).

Travelers' Demand on Lumbermens' Bond Was Improper

Ames asserts that Lumbermens "refused," without justification, to pay Travelers' 2003 demand

under the Bond.  This erroneous contention is an effort not only to claim some breach by Lumbermens

of an alleged duty to Ames to pay Travelers under the bond, but also to "color" Lumbermens' actions

as somehow improper.  The evidence shows that, to the contrary, Lumbermens never denied or refused

Travelers' demand.  Lumbermens made justified requests to Travelers for information, to which

Travelers refused to respond.  As the deposition and documentary evidence confirms, there were bond

coverage issues with Travelers' 2003 demand, and the Demand itself violated Travelers' agreements

with Ames.

A.      Travelers' Demand Was Improper On Its Face

Paragraph 1 of the Bond required, by its clear terms, that a demand under the Bond specify "the

amount due, either as security or for payment or for reimbursement pursuant to the Agreements," to fix

the liability of both the Principal (Ames), and the Surety (Lumbermens), to make payment under the

Bond, as follows:

1)  Within seven (7) business days of Surety's receipt of a demand for payment under this
    Bond ("Demand"), Surety shall pay to the Obligee the amount of such Demand. The
    Obligee's Demand to the Surety of the amount due, either as security or for payment or for
    reimbursement pursuant to the Agreement(s), shall be absolute proof of the existence and
    extent of the liability of the Principal and the Surety to the Obligee hereunder. The Obligee
    may present one or more Demands at any time in its sole discretion, provided however,
    Surety shall not be obligated to pay an aggregate amount in excess of the penal sum of the
    bond. [emphasis added].[4]

Paragraph 2 of the Bond stated that Travelers could demand the full penal sum if Travelers'

demand was "for security," in which event the Bond further provided that Travelers was to hold the

proceeds as "collateral" (defined in the Bond as "Bond Collateral"), to be applied from time to time in

Travelers' discretion, provided further that any unapplied portion of such Bond proceeds received by

Travelers must be returned to Lumbermens, as follows:

2)  In the event that Obligee shall demand the entire penal sum of the Bond under a Demand
    (less any previous amounts paid to Obligee under the Bond), Obligee shall hold all funds
    ("Bond Collateral") received as security for the Obligations and shall apply such funds to
    the Obligations from time to time in its sole discretion. At such time as Obligee determines
    in its sole discretion that all of the Obligations are fully and finally paid and such payment
    is not subject to avoidance or other turnover Obligee shall return to the Surety the unapplied
    portion of the Bond Collateral. * * * The Principal shall not at any time have any rights or
    property interests in this Bond, the Bond Collateral or other proceeds of the Bond.[5]

Travelers' demand, which was for the full penal sum, failed to state the purpose of its

"Demand," as required by Bond paragraph 1.  It also demanded the full penal sum without stating that

the demand was solely for the purpose of security, as required by paragraph 2 of the Bond.[6]

---

[4] See Bond, Gamell Aff. Ex. A.
[5] Bond, Gamell Aff. Ex. A, Paragraph 2.
[6] See Demand, Gamell Aff. Ex.C.

- 4 -

Lumbermens requested additional information to cure the deficiency in Travelers' Demand and to

assure Lumbermens that its Bond proceeds would be applied only to "Obligations" actually covered by

the Bond, as the term "Obligations" was defined in the Bond.  But Travelers refused to provide any

information, simply insisting upon payment of the full penal sum.[7]  Thus, in fact, Lumbermens did not

"refuse" to pay.  It was  Travelers that refused to provide the missing information required by the Bond

to establish a proper demand under the Bond's terms.[8]

    B.      <u>The Back-Dated Agreements Between Ames and Travelers Were Not Covered</u>

The Bond stated that it applied only to "agreements" already "entered into" between Ames and

Travelers as of the Bond's effective date (November 1, 2000).[9]  However, discovery in this Adversary

Proceeding has revealed that, in fact, no mutually executed agreements between Ames and Travelers

had been entered into at the time the Bond was issued.[10]  Only "binders" or "proposals" of a general

nature had been issued by Travelers, none of which contained the critical defined term "Obligations".

---

[7] See May 22, 2003 through June 3, 2003 correspondence between Lumbermens and Travelers, Gamell Aff. Ex. G.

[8] See correspondence, Gamell Aff. Ex. G.  The Travelers representative who signed Travelers' demand confirmed that there was nothing in the Bond that prohibited Lumbermens from asking questions in response to a demand (Transcript of Deposition of Coffey, Gamell Aff. Ex. H, Tr. at 131:14-23).  It is undisputed that the Bond was drafted by Travelers, not by Lumbermens, and therefore any ambiguity should have been construed against Travelers, as the acknowledged sole drafter See *Zhang v. Omnipoint Communs. Enters.*, 272 Conn. 627, 635 (2005).

[9] See Bond, Ex. A, first Whereas clause:" WHEREAS, Obligee has issued certain insurance policies on behalf of the Principal and <u>has entered into</u> certain other agreements related to said insurance policies with the Principal which may be amended and/or renewed from time to time (herein collectively referred to as the "Agreement(s)"), and . . ." (emphasis added).

[10] The Bond referred to such "Agreements" for the meaning of the term "Obligations," which was supposedly defined in such agreements.  However,  the earliest of the Ames/Travelers agreements, covering the so-called 1998 policy year, was not signed by Ames until December 5, 2000, and not countersigned by Travelers until December 11, 2000, more than seven weeks after Lumbermens' Bond had been issued (Transcript of Deposition of Lawson, Gamell Aff. Ex. I, Tr. at 92-93; 98-100; 101-102).  The so-called 1999 agreement between Travelers and Ames does not bear dated signatures, but was apparently prepared on February 28, 2001 and not returned to Ames in signed form by Travelers until March 8, 2001 (Lawson, Gamell Aff. Ex. I, Tr. at 105-107).  The so-called 2000 agreement between Travelers and Ames – the first agreement to contain any reference to a surety bond in the amount of Lumbermens' Bond – was not signed by Ames until February 23, 2001 (Gamell Aff. Ex. J., at Ames to Kemper 00479).  According to Ames' Risk Manager, Pat Lawson, prior to December 5, 2000, the only document that reflected what Travelers was charging Ames and what services were being provided was a "proposal" that had been generated by Travelers and sent to Ames prior to November 1, 1998. (Lawson, Gamell Aff. Ex. I, Tr. at 96: 14-25). In this regard, the Connecticut Statute of Frauds, at Conn. Gen. Stat. § 52-550(3), specifies that a writing must be signed, in order to form a contract "upon any agreement that is not to be performed within one year from the making thereof" - which would certainly apply to any "Agreement(s)" between Travelers and Ames for the provision of self-insured and high-deductible risk management services expected to be furnished over a period of at least a year (and most likely several years, as per the various exhibits).  New York law is similar, if it is found applicable, under N.Y. Gen. Oblig. Law § 5-701(a).

After the Bond was issued, Ames and Travelers "back-dated" several "Agreements" concerning the various insurance policy periods.  If Lumbermens had become aware during discovery in the Connecticut Lawsuit that there were, in fact, no "agreements" between Ames and Travelers extant on the Bond's issuance date, Travelers' entire right to recovery from Lumbermens may have been defeated or severely diminished.[11]  In any event, Travelers faced a major hurdle in establishing what "Obligations" the bond covered or secured, since there was no agreement that included the defined term "Obligations" between Ames and Travelers as of the date of the Bond's issuance.

C.    Travelers' Demand Violated The Terms of Its Agreement With Ames

Although not covered under the Bond, the back-dated agreements between Ames and Travelers still governed the relationship as between Ames and Travelers.  Those agreements specified the terms and conditions under which Travelers could make demand under the Bond.  Travelers violated the terms of those agreements in making demand under the Bond.

The deposition testimony and exhibits confirm that the sole basis for Travelers' Demand was that Ames had failed to provide acceptable replacement collateral for the Bond, within the time required, and Ames had thereby "defaulted" as a consequence.[12]  However, Travelers knew that the "Collateral And Remedies" section of its so-called 2000 Agreement with Ames controlled Travelers' right to demand replacement of, or draw upon, the surety bond collateral it held.[13]  The 2000 Agreement required Ames to comply with Travelers' requests for changes in the surety bond collateral,

---

[11] Nor did the Bond permit Ames and Travelers to add, after the fact, obligations to the Bond after its issuance.  The Bond's first "Whereas" clause, after reciting the "Agreements," adds the phrase, "which may be amended and/or renewed from time to time."  This clause merely permitted Ames and Travelers to amend and/or renew the "Agreement(s)" already in place as of November 1, 2000, without thereby discharging the surety under the Bond. If the language were intended to permit the later addition of new Bonded obligations, the phrase "which may be amended . . . ." would not have been employed, and instead the phrase would have stated "together with any amendments. . . ."  Other provisions of the Bond reinforce that the Bond does not *cover* after-executed documents, but will not be *discharged* if such documents are entered into.  *See, e.g.,* paragraph "4(iv)" of the Bond, which would not have been necessary at all if the Bond automatically covered after-executed agreements.

[12] Transcript of Deposition of Coffey, Gamell Aff. Ex. H, Tr at 67:7-24, 68:15 – 69:4.  See also similar statement of Attorney Waxman, counsel for Travelers, during November 5, 2007 proceedings (Gamell Aff. Ex.X, Tr. at pp. 30-31).

[13] Transcript of Deposition of LaLiberte, Gamell Aff. Ex. K, Tr. at 50:3-52:8.

but only "within fifteen (15) days" after Ames' receipt of written notice sent postage prepaid, certified

mail return receipt requested addressed to Pat Lawson, Ames' Risk Manager.[14]  Only upon a "default"

could Travelers draw upon its letters of credit or surety bond, and a "default" in this respect did not

occur until and unless Ames failed to deliver the replacement for the surety bond collateral within the

15-day time period specified.[15]  That never happened.

   Travelers did not follow the procedures required by the 2000 Agreement, and made demand on

the Bond before a "default" by Ames had occurred.  Travelers never provided a written, 15-day

certified mail notice to Ames' risk manager as required by the agreement. Instead, a Travelers in-house

counsel telephoned Ames' in-house General Counsel, David Lissy, on May 19, 2003, just two days

before Travelers sent its demand to Lumbermens.  According to Lissy, he was informed that Travelers

would be sending a letter stating that "Kemper [*i.e.*, Lumbermens] was an unacceptable surety in light

of its financial condition and since Ames could not replace Kemper, Travelers would exercise its right

to draw down."[16]  Travelers' demand to Lumbermens was sent two days later, on May 21, 2003.  It

was not until May 22, 2003 that Travelers' in-house counsel wrote Lissy, purportedly to "confirm" the

May 19th phone call, state Travelers' position, and "reserve" Travelers' right to call upon some or all of

the collateral.[17]  Accordingly, as Travelers did not follow the required procedures for triggering Ames'

obligation to replace the Lumbermens bond, Ames never defaulted under the 2000 Agreement, and

Travelers never became entitled to draw upon its collateral.[18]  Travelers' Bond demand was, therefore,

in direct violation of its agreements with Ames, and non-conforming under the Bond.

   In sum, Lumbermens had significant defenses to Travelers' Demand.

---

[14] See Gamell Aff. Ex. J, 2000 Agreement, Lumbermens 13, at p. 21, "C. Amended Surety Bonds," and p. 28, "H. Notice" and p. 8.
[15] See Gamell Aff. Ex. J., 2000 Agreement, Lumbermens 13, at p. 24, subparagraph 2 and p. 23, "B. Defaults And Remedies, subparagraph 1(c)".
[16] Gamell Aff. Ex. L., contemporaneous memo to file of David Lissy dated May 21, 2003.
[17] Gamell Aff. Ex. M, memorandum of David Lissy to de Aguiar, Von Mayrhauser and Lawson dated May 22, 2003.
[18] We do not deal at this time with the implications of the automatic stay's application to Travelers actions.

Ames Never Asserted Any Position Regarding The Travelers/Lumbermens Dispute

At the time, Ames took no position one way or the other regarding Travelers' Bond demand. However, Ames' General Counsel, David Lissy, took the first steps in facilitating a settlement dialogue between Travelers and Lumbermens, upon learning that Lumbermens had received a full penal sum demand under the Bond.[19] Between May 28 and May 30, 2003, Lissy relayed information back and forth between Travelers' in-house counsel (Boardman) and outside counsel (Waxman), on the one hand, and Lumbermens' outside counsel (Rittmaster), on the other hand.  On May 30th, Rittmaster emailed Lissy asking for the name and telephone number of Lissy's contact at Travelers, stating, "Kemper may want to open a dialogue."[20]  Lissy responded, "I guess you would have to go through counsel if you want a business contact." Lissy's June 2, 2003 letter to Travelers' in-house counsel Boardman confirms that Lissy responded to Rittmaster by telling him Lissy would provide the contact information for Boardman and Waxman, and that Lissy told Rittmaster "he could take it from there."[21]

At his deposition, Lissy agreed that by saying "take it from there" he was "going to get [himself] out of the middle of this discussion and connect Kemper and Travelers through their counsel directly to have conversations."[22] On June 2, 2003, Lissy wrote to Rittmaster by fax and provided the names and phone numbers of Boardman and Waxman.[23]  Lissy testified that his letter indicates he had no objection to counsel for Lumbermens and Travelers being in touch with each other, and that nothing in the written record during the May-June 2003 period states that Lissy asked to be kept informed about, or to be a party to, any Travelers/Lumbermens discussions.[24]  Accordingly, Ames, through its

---

[19] Gamell Aff. Ex. N, memorandum of David Lissy to files dated May 29, 2003; Transcript of Deposition of Lissy, Gamell Aff. Ex. O, Tr. at 179:8 – 181:25
[20] Gamell Aff. Ex. P, email exchange between Lissy and Rittmaster on May 30, 2003.
[21] Gamell Aff. Ex. Q., Lissy letter to Boardman dated June 2, 2003.
[22] Transcript of Deposition of Lissy, Gamell Aff. Ex. O, Tr. at 189:22–191:3.
[23] Gamell Aff. Ex. R, Lissy letter to Rittmaster dated June 2, 2003.
[24] Transcript of Deposition of Lissy, Gamell Aff. Ex. O, Tr. at 192:4–193:13; 194:3–20.

General Counsel, did not assert any role for Ames in the settlement or resolution of Travelers' claim under the Bond.

On June 4, 2003, Travelers commenced the Connecticut Lawsuit against Lumbermens.[25]  The next day, June 5, 2003, Travelers' in-house counsel (Boardman) faxed a copy of the complaint to Lissy.[26]  Lissy testified that he almost certainly informed one or more of the remaining Ames officers (de Aguilar, Von Mayrhauser, Lawson) upon his receipt of the Travelers complaint against Lumbermens, and as they would have informed each other about it, all would have known about it.[27]  Ames' outside counsel, Weil Gotshal, knew of the lawsuit no later than June 16, 2003.[28]  Despite that Ames' most senior officials and its outside bankruptcy counsel were almost immediately aware of the suit by Travelers against Lumbermens, nothing in the records produced in this Adversary Proceeding or in the testimony of any witness suggests that Ames ever took any action to become involved in the litigation, or ever asserted that any rights or property interests of Ames were involved in the action.  Nor did Ames ever assert that it was an indispensable party to the action, or that the action should be removed to the Bankruptcy Court nor did Ames inquire about the action as the months rolled by.

Ames' outside counsel, Barry Gold of Weil Gotshal, knew by no later than August 18, 2004, that Travelers' suit against Lumbermens had been settled pursuant to an agreement by which Lumbermens had paid funds into a trust account and that a priority of application by Travelers of its collateral was a part of that settlement.[29]  Attorney Gold received a copy of the November 4, 2003 settlement agreement letter from Travelers' outside counsel, Eric Waxman, no later than August 24,

---

25 Gamell Aff. Ex. D.
26 Gamell Aff. Ex. S, Boardman Fax to Lissy of June 5, 2003; Transcript of Deposition of Boardman, Gamell Aff. Ex. T, Tr. at 216:6 – 217:8.
27 Transcript of Deposition of Lissy, Gamell Aff. Ex. O, Tr. at 194:21 – 196:14.
28 Gamell Aff. Ex. U, Ames' Supplemental Privilege Log, entry no. 89, memorandum from David Lissy concerning "Travelers/Kemper litigation" to, among others, Troy Cady of Weil Gotshal; Gamell Aff. Ex. O, Lissy at Tr. 145:9-21.
29 Gamell Aff. Ex. V, August 18, 2004 email from Waxman to Gold with attached draft stipulation, Stipulation p. 3, recitals "G" and "H".

2004.[30]  Travelers' in-house counsel (Boardman) also testified that she recalled a conference call with Attorney Gold during which he was informed that a settlement of the litigation between Lumbermens and Travelers had been finalized, and Ms. Boardman did not have the impression that Mr. Gold objected to the settlement.[31]  No action was taken by Ames regarding the collateral application terms of the Letter Agreement until Ames' Adversary Complaint was filed, more than two years after Golds' receipt of the Letter Agreement, in November 2006.

Accordingly, by facilitating direct settlement communications between Lumbermens and Travelers in May and June, 2003, by electing not to intervene in or seek removal of Travelers' suit against Lumbermens, and by failing to advise Lumbermens of any challenge to the November 2003 settlement for more than two years after its outside counsel had knowledge of all the terms of that settlement, Ames confirmed by its conduct that the dispute and settlement between Lumbermens and Travelers was not interfering with Ames' bankruptcy liquidation.  During that same period, and thereafter, Ames continued to voluntarily make payments to Travelers, discharging Ames' obligations to Travelers as they became due and also thereby discharging any corresponding obligations of Lumbermens, as surety, to the same extent.  Ames' conduct during those years belies its current contention that the November 2003 Letter Agreement had immediate negative impact on Ames' estate.

Furthermore, Ames' conduct from May 2003 to November 2006 is consistent with the terms of the key documents involved in the issuance of the Bond by Lumbermens on behalf of Ames.  The Bond itself expressly recites that, "The Principal shall not at any time have any rights or property interests in this Bond, the Bond Collateral or other proceeds of this Bond."[32]  The Indemnity Agreement executed by Ames in favor of Lumbermens prior to the issuance of the Bond grants to Lumbermens

---

[30] Gamell Aff. Ex. W.
[31] Transcript of Deposition of Boardman, Gamell Aff. Ex. T., Tr. at 93:7 – 94:24.
[32] Gamell Aff. Ex. A., Bond para. 2, last sentence.

total discretion in dealing with claims under Lumbermens' bonds and in dealing with modifications to

the bonded contract and even to the Bond itself.[33]

Travelers, the only party with the right to enforce the Bond, was satisfied with the settlement it

reached with Lumbermens in November 2003. As Mr. Waxman told the Bankruptcy Court in the

proceedings of November 5, 2007, the demand was sent and the lawsuit commenced by Travelers to

"preserve" the Bond as collateral and, in light of, among other things, "the promise of trial, litigation,

appeals . . .," Travelers considered the settlement "a very good result."[34]

The Adversary Proceeding, Ames' Settlement With Travelers,
And Ames' 2009 Amendment of the Adversary Complaint

Three years after the execution of the Letter Agreement and the establishment of the Trust, Ames

commenced this Adversary Proceeding in the Bankruptcy Court against Travelers and Lumbermens.

The Adversary Complaint filed on November 3, 2006 (Gamell Aff. Ex. Y) had as its central thrust the

refusal of Travelers to establish a liquidated sum for the total obligations owed by Ames to Travelers. Its

limited demands for relief against Lumbermens requested a declaratory judgment that Ames' obligations

to Travelers should be satisfied first from the Bond prior to any demand by Travelers on the letters of

credit (Ames' Second and Third Claims for Relief), contrary to the provisions of the Letter Agreement

that had settled the Connecticut Lawsuit.

On January 9, 2007, Lumbermens filed its Answer and Counterclaims to the Adversary

Complaint (Gamell Aff. Ex. Z). The first three affirmative defenses Lumbermens asserted were (i) that

the bankruptcy court lacked subject matter jurisdiction, (ii) that the proceedings were "not core," and (iii)

that the mandate of the Bankruptcy Court to hear the dispute should be withdrawn. Accordingly, the

dispute over whether the bankruptcy court originally had jurisdiction to hear this Adversary Proceeding

has been pleaded and known from the outset.

---

[33] Gamell Aff. Ex. B, "Surety's Consent To Changes" (paragraph 2); "Surety's Rights Re: Claims" (paragraph 5); and
"Indemnitors' Waiver Of Notice" (paragraph 10).
[34] Gamell Aff. Ex. X, November 5, 2007 Transcript, Tr. at 30:18 – 31:7; 31:15 – 32:1.

The December 2008 Settlement Order

On December 15, 2008, the Bankruptcy Court entered a "Settlement Order" ("2008 Order") in the main bankruptcy case setting forth the terms under which Ames' Adversary Proceeding as against Travelers, and Travelers' Proof of Claim in the Ames' bankruptcy, would be settled (Gamell Aff. Ex. AA). The complicated settlement resolved Ames' motion to approve its settlement with Travelers, under which Ames agreed to have Travelers paid out of the remaining letter of credit, whereupon Ames' bank would be reimbursed from Ames' cash collateral, all of which was acceptable to Lumbermens, except that Ames' motion also sought an order requiring that Travelers reimburse Ames out of the Trust Monies for the $6.5 million Ames was proposing to pay Travelers by way of final settlement with it, via the letter of credit (to which Lumbermens objected). Among other things, the 2008 Order made it clear that the approval of the Ames/Travelers settlement and of its payment out of the proceeds of the remaining letter of credit Travelers held, did not alter or affect any of Lumbermens' defenses or positions in the Adversary Proceeding or otherwise (see 2008 Order, pp. 3-4).

Also of relevance is the decretal paragraph ordering that Lumbermens not commence any action or proceeding in any other court or venue that concerns the Letter Agreement, the Trust Monies, the Bond or any documents or transactions related thereto, prior to Lumbermens' giving forty-five days' notice to counsel for Ames (see 2008 Order, second full decretal paragraph, p. 7). This paragraph acknowledged Lumbermens' position that the Bankruptcy Court lacked jurisdiction to hear the Adversary Proceeding as against Lumbermens, but provided Ames with a notice period so that it could seek relief, should it choose to do so, from the Bankruptcy Court, if Lumbermens commenced an action in another court (*e.g.*, against the Bank of New York to seek return of the Trust Monies).

After Travelers was dismissed from the Adversary Proceeding, Ames served its Second Amended Complaint, dated March 31, 2009, this time solely against Lumbermens (and against an affiliate of Lumbermans against which all claims have since been dismissed (Gamell Aff. Ex. BB). This

marked the true beginning of the Adversary Proceeding as against Lumbermens, as prior to that time the focus of the proceedings had been on Travelers, and the related Bond and Letter of Credit collateral issues, that were resolved in the 2008 Order.

Ames' Second Amended Complaint is still the operative pleading in the Adversary Proceeding (with the customs bond issues having been dismissed by stipulation). The seven claims against Lumbermens that remain are the "First Claim" through the "Sixth Claim," and the "Tenth Claim."

Although 11 U.S.C. § 105 (2006) is cited repeatedly in the Adversary Proceeding, the only claim seeking recovery of funds or damages against Lumbermens that arises under the Bankruptcy Code itself is the claim for alleged violation of the automatic stay ("Fourth Claim for Relief"), which the Rehabilitator submits is wholly without merit, and which in any event is not a "core" proceeding, as is further discussed below.

Lumbermens' Answer to the Second Amended Complaint (Gamell Aff. Ex. CC) once again preserved as its first three affirmative defenses Lumbermens' position that the Bankruptcy Court lacked subject matter jurisdiction, that the proceedings were not core, and that the reference to the Bankruptcy Court should be withdrawn (see First, Second and Third Affirmative Defenses, p. 8).[35]

Ames Has No Interest in the Trust Monies

Ames erroneously contends that Lumbermens' only claim to entitlement to the Trust Monies rests upon the Letter Agreement. That is incorrect. The $8 million currently in the Trust was Lumbermens' money before it was deposited into the Trust by Lumbermens, as Grantor, and Lumbermens is entitled to have the Trustee return the $8 million by the terms of the Trust Agreement. Furthermore, the Bond itself provides that the Trust Monies, as excess Bond Collateral, are to be returned to Lumbermens, and the Bond states that Ames has no interest in such proceeds.

---

[35] Lumbermens subsequently waived its Jury Demand.

As discussed above, Paragraph 2 of the Bond permitted the full penal sum to be demanded, but only to be held by Travelers as security (designated "Bond Collateral" in the Bond).  The Bond further declares that at such time as Travelers determines in its sole discretion that all of Ames' "Obligations" to Travelers under the "Agreements" referenced in the Bond are fully and finally paid, Travelers "shall return *to the Surety* the unapplied portion of the Bond Collateral." (*emphasis added*).[36]  The last sentence of that same paragraph unequivocally confirms Ames' lack of any rights in or to the Bond Collateral, stating, "The Principal shall not at any time have any rights or property interests in this Bond, the Bond Collateral or other proceeds of this Bond."

Accordingly, the Bond dictated that the proceeds of a full penal sum demand under the Bond were not to be immediately applied to the Obligations owing from Ames to Travelers, nor did such proceeds become funds in which Ames had any interest.

These provisions of the Bond were not altered in any degree by the Letter Agreement between Travelers and Lumbermens, or by the Trust Agreement between and among Lumbermens, Travelers, and Bank of New York.  Under all three documents, all Bond proceeds not applied by Travelers to pay Ames' "Obligations" are required to be returned to Lumbermens.[37]  The Trust Agreement itself, under which Lumbermens delivered $8 million of its assets to the Bank of New York, as Trustee, makes clear that only Travelers and Lumbermens are potential recipients of the Trust Monies under the conditions outlined in the Trust Agreement.  Under these operative documents, no property interest or right in the Trust Monies has arisen, or could have arisen, in favor of Ames.  In no circumstances do these documents provide for the payment of Bond proceeds to Ames, the principal, whose default triggers Travelers' right to draw on the Bond in the first place.[38]

---

[36] Bond, Gamell Aff. Ex. A.
[37] Gamell Aff. Ex. E, Letter Agreement, paragraph "5"; Gamell Aff. Ex. F, Trust Agreement, paragraph "9".
[38] In addition, the "Place in Funds" letter executed by Ames as an inducement to Lumbermens to issue the Bond, required Ames to place Lumbermens in funds for any bond Demand prior to Lumbermens being required to pay it (Gamell Aff. Ex. DD, "Place in Funds Letter").  And the Indemnity Agreement required Ames to exonerate and indemnify Lumbermens for

- 14 -

The Order Of Rehabilitation And Subsequent Proceedings
In The Bankruptcy Court Leading To This Motion

Following Ames' filing of its Second Amended Complaint in 2009, the parties engaged in

discovery, which was completed in 2011.  Efforts at preparing a pretrial order were underway when

Ames' former bankruptcy counsel, Dewey LeBoeuf, went into bankruptcy.  New counsel were

eventually substituted for Ames, and a new schedule for completion of a pretrial order and for trial had

just been set when an Order of Rehabilitation was entered against Lumbermens in the Illinois State

Court on July 2, 2012 (the "the Rehabilitation Order").

Upon learning of the Rehabilitation Order, counsel for Lumbermens filed a copy of it with a

covering "Notice of Entry" in the Adversary Proceeding on July 6, 2012 (Gamell Aff. Ex. EE).  After

three conferences with Bankruptcy Judge Gerber regarding, among other things, the potential conflict

between Bankruptcy Court and Illinois State Court jurisdiction in light of the Rehabilitation Order and

the McCarran-Ferguson Act, a "Stipulation And Order Regarding 'Standstill Agreement'" was entered

on August 1, 2012 ("Standstill Order," Gamell Aff. Ex. FF).

On September 14, 2012, as required by the Standstill Order, the Rehabilitator presented his

written position as to jurisdiction to Ames' Counsel (Gamell Aff. Ex. GG).  Subsequently, the

Bankruptcy Court granted the Rehabilitator leave to move for withdrawal of the reference to the

Bankruptcy Court pursuant to 28 U.S.C. § 157(d)  and Bankruptcy Rule 5011, but also directed that

Ames' Jurisdiction Motion and the Rehabilitator's cross-motion be briefed while the §157(d) motion

was still pending.

---

any loss paid under the Bond.  (Gamell Aff. Ex. B).  Accordingly, in any circumstance where Ames demanded the proceeds
of the Bond from Lumbermens, Lumbermens would have defenses of set-off and recoupment in the exact same sum that
Ames demanded.

The Lumbermans Rehabilitation Estate

The estimated total liabilities of the Lumbermens rehabilitation estate are in the approximate

amount of $1 billion, while the estimated total assets are slightly in excess of $500 million.  The

Lumbermens rehabilitation potentially involves claimants in 49 different states relating to exposures for

workers compensation liability, mass environmental and mass tort claim liabilities, and surety bond

exposures.[39]

POINT I

The McCarran-Ferguson Act Mandates That This<br>
Adversary Proceeding Be Stayed Or Dismissed,<br>
As The Illinois State Rehabilitation Proceedings Pre-Empt<br>
The Bankruptcy Court And Divest It Of Jurisdiction Over This Dispute

As explained in *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999), the McCarran-Ferguson Act (15

U.S.C. §§ 1011–1015 (2006)) was prompted by the Supreme Court's holding in 1944 that insurance

companies doing business across state lines were engaged in interstate commerce.  In response,

Congress passed the McCarran-Ferguson Act to secure to the States the regulation of the business of

insurance.  Section 2(b) of the McCarran-Ferguson Act "precludes application of a federal statute in

face of state law 'enacted . . . for the purpose of regulating the business of insurance,' if the federal

measure does not 'specifically relate to the business of insurance' and would 'invalidate, impair, or

supersede' the State's law." *Id.* at 306-307.

The McCarran-Ferguson Act states, in part, as follows, at 15 U.S.C. § 1012:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted
> by any State for the purpose of regulating the business of insurance, or which imposes a fee
> or tax upon such business, unless such Act specifically relates to the business of insurance
> [except certain anti-trust laws].

The Rehabilitation Order was entered pursuant to Illinois' comprehensive state insurance

regulatory scheme (*see, e.g.*, 215 Ill. Comp. Stat. 5/189, /191, /192, as part of which all claims against

---

[39] Gamell Aff. Para. 35.

- 16 -

the insolvent insurer's estate are to be brought in the rehabilitation court, and all claims are to be paid

and distributions made in accordance with the priorities set forth in the Illinois Insurance Code.  The

Rehabilitation Order requires all litigants and other claimants against Lumbermens (including Ames) to

pursue collection of any claims against Lumbermens only in the Illinois State Court insolvency

proceedings).  As was held in *Dep't of Treasury v. Fabe*, 508 U.S. 491, 505–06 (1993), "The primary

purpose of a statute that distributes the insolvent insurer's assets to policyholders in preference to other

creditors is identical to the primary purpose of the insurance company itself:  the payment of claims

made against policies."

It is well-settled that courts must recognize rights of statutory insurance receivers in reciprocal

states, in regard to provisions requiring the prosecution of claims against the company in receivership

in the insurance receivership court. *See, e.g., G.C. Murphy Co. v. Reserve Ins. Co.*, 54 N.Y.2d 69

(1981); *Official Comm. of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*, 2006 U.S.

Dist. LEXIS 45510, 2006 WL 1751793 (D.N.J. June 21, 2006).  Illinois, New York, and Connecticut

are "reciprocal states", under the definitions contained in the Uniform Insurers Liquidation Act as

enacted by Illinois (215 Ill. Comp. Stat. 5/221(1)) and New York (N.Y. Ins. Law § 7408(b)(6)), and in

Connecticut's enactment of the Model Insurers Rehabilitation and Liquidation Act (Conn. Gen. Stat.

§ 38a-905(19)).

It has also been consistently held that where interests in property are to be determined pursuant

to such a state statutory scheme for the regulation of the business of insurance, the state insurance law

"reverse preempts" the Bankruptcy Code, and the provisions of the state insurance law take precedence

and must be enforced despite potentially contrary provisions of the Bankruptcy Code, including

circumstances where property rights are disputed between debtors and state insurance liquidators.

*Logan v. Credit Gen. Ins. Co. (In re PRS Ins. Group, Inc.)*, 294 B.R. 609 (Bankr. D. Del. 2003), aff'd

2005 U.S. Dist. Lexis 22611 (D.Del. 2005); *In re MF Global Holdings Ltd.*, 469 B.R. 177, 195 n.17

(Bankr. S.D.N.Y. 2012); *In re Med. Care Mgmt. Co.*, 361 B.R. 863 (Bankr. M.D. Tenn. 2003); *Wagner v. Amwest Ins. Group*, 285 B.R. 447 (Bankr. C.D. Cal. 2002); *Adv. Cellular Sys. v. Mayol* (*In re Adv. Cellular Sys.*), 235 B.R. 713 (Bankr. D.P.R. 1999).

For example, in *Logan v. Credit General Ins. Co. (In Re PRS Insurance Group, Inc.), 294* B.R. 609 (Bankr.D.Del. 2003), *aff'd* 2005 U.S. Dist. Lexis 22611 (D.Del. 2005), the Bankruptcy Court held that it had been divested of jurisdiction to hear a debtor's adversary complaint against an insolvent insurer's Ohio state liquidator, as follows:

> Ohio's policy of maximizing the return to CGIC's policyholders and its administrative scheme setting forth priority of payments would be frustrated by allowing PRS to use the Bankruptcy Code to recover property from CGIC and thus be paid with funds that would otherwise be paid to creditors under the priorities set forth under the Ohio statute. Thus, we conclude that the Bankruptcy Code "impairs" the Ohio insurance liquidation statute at issue and is reverse preempted by the McCarran-Ferguson Act. As a result, we lack subject matter jurisdiction over the adversary proceeding and it must be dismissed.

294 B.R. at 613. The Delaware District Court affirmed the dismissal for lack of jurisdiction, holding that since the Trustee was seeking affirmative relief, "the adversary proceedings 'impair' the Ohio Liquidation Act and is reverse preempted by the McCarran-Ferguson Act" (2005 U.S. Dist. Lexis 22611*8).

As a legal and practical matter, it would be completely unworkable for the Bankruptcy Court, in Ames' own bankruptcy case or otherwise, to take control of any part of Lumbermens' nearly $1 billion rehabilitation proceeding and attempt to usurp the Rehabilitator's administration of Lumbermens' assets (which involves the coordinated efforts of multiple state insurance guaranty funds as well). Nor was it ever contemplated that bankrupt debtors having claims against Lumbermens' rehabilitation estate could litigate those claims in their own bankruptcies around the country and thus "pick apart" the estate from under the Rehabilitator's supervision (whether by asserting *quasi in rem* jurisdiction over assets within the territorial jurisdiction of the local courts, or otherwise). The Bankruptcy Code itself limits Bankruptcy Court jurisdiction over insurance companies (11 U.S.C. § 109 ), further confirming the

intent of Congress under McCarran-Ferguson and the Bankruptcy Code to leave insurance regulation to the States.

The cases cited by Ames in its memorandum to downplay the significance and impact of McCarran-Ferguson and the Rehabilitation Order are inapposite or are mischaracterized. For example, Ames' description of the alleged holding of the decision it cites as *Logan v. Credit Gen. Ins. Co. (In re PRS Ins. Group, Inc.)*, 335 B.R. 77 (Bankr. D. Del. 2005), is misleading, absent the additional language by which the Court qualified the basis of its holding. Ames argues the decision held that the "bankruptcy court had exclusive jurisdiction over claims by insurer's state court liquidator against the bankruptcy estate" (*Ames' Memo., p. 20*). Actually, the Bankruptcy Court only concluded it had "jurisdiction over the adversary proceeding and that the McCarran-Ferguson Act was not implicated because the Trustee was not seeking affirmative recovery from CGIC." *Id.* at 82 (emphasis added). By way of contrast, in this Adversary Proceeding, Ames is "seeking affirmative recovery" from Lumbermens. Ames' citation of "*PRS Group*" is thus inapplicable, except to confirm that, as Lumbermens has asserted, the "exclusive" jurisdiction of the Bankruptcy Court in relation to proofs of claim is limited to the "allowance and disallowance of claims" against the estate (*id.* at 84), and that the underlying merits and/or amount of the claim can be determined elsewhere (*id.* at 81).[40]

The next authority cited by Ames, *In re Dominguez*, 312 B.R. 499 (Bankr. S.D.N.Y. 2004), has no relevance to this matter. In that case, the City of New York obtained a judgment foreclosing a tax lien on a personal residence, six months after the owner filed bankruptcy, and the City then served her with a Notice that ownership of her property had been transferred to the City. Ames' effort to equate this matter with the facts of *Dominguez* is simply wrong.

---

[40] Furthermore, Ames' Memorandum failed to mention that the PRS court had previously ruled that the Bankruptcy Court's jurisdiction over the affirmative claims filed by the Trustee had been divested by McCarran-Ferguson, and that the Trustee's affirmative claims, comparable to Ames' claims, had already been dismissed for lack of subject matter jurisdiction. *See Logan v. Credit General Ins. Co. (In Re: PRS Insurance Group, Inc.)*, 294 B.R. 609 (Bankr.D.Del. 2003), *aff'd* 2005 U.S. Dist. Lexis 22611 (D.Del. 2005), discussed *supra*.

Also inapposite is *Indiana Lumbermens Mut. Ins. Co. v. Rusty Jones, Inc., (In re Rusty Jones, Inc.)*, 124 B.R. 774 (Bankr. N.D.Ill. 1991) (a "report and recommendation" by the Bankruptcy Court). The fact setting in *Rusty Jones* was the opposite of the current dispute. The adversary proceeding in *Rusty Jones* was filed by the insurance company <u>against</u> the debtor, not <u>by</u> the debtor. *Rusty Jones* is thus inapplicable to this Adversary Proceeding.

Similarly, at issue in *In re Agway, Inc.*, 357 B.R. 195 (Bankr. N.D.N.Y. 2006) was a claim filed by the insurance carrier against the debtor, not an adversary proceeding commenced by the debtor against the insurance carrier. Indeed, the *Agway* court confirmed that if it had been the debtor who had commenced a claim against the insurer, the insolvent insurer "may well have had a colorable argument that the fourth prong of the McCarran-Ferguson Act test had been met, and that this Court lacks jurisdiction." (*Id.* at 203–04).

Thus, this Adversary Proceeding must be dismissed and Ames' claims pursued in Illinois or, alternatively, the federal court must abstain from exercising its jurisdiction pending developments in the state Rehabilitation court.[41] Ames is, in essence, contending that the Illinois state court rehabilitation order violates the Bankruptcy Code and is unenforceable as against Ames because Ames is a debtor that has previously commenced an adversary proceeding asserting "claims" against Lumbermens. Based upon the authorities cited above, it has consistently been held that in such instances primary jurisdiction rests with the state court, as an insurance regulatory matter under McCarran-Ferguson.

---

[41] See, *Lac D'Amiante Du Quebec, Ltee v. American Home Assur. Co.*, 864 F.2d 1033, 1045 (3d Cir. N.J. 1988) (assumption of jurisdiction by the federal court in a suit against an insolvent insurer in liquidation proceedings would be highly destructive of the state's regulatory scheme. [***] We note that most courts that have discussed this question have held abstention and stay or dismissal appropriate in the circumstance of a suit against an insurer in liquidation proceedings.); *Koken v. Reliance Group Holdings, Inc. (In re Reliance Group Holdings, Inc.)*, 273 B.R. 374, 401 (Bankr. E.D. Pa. 2002) ("The Third Circuit recognized the state's interest in regulating insurance companies, writing: 'The regulation of insurance companies unable to meet their obligations entails the type of strong state interest in which application of Burford abstention is appropriate. Like the valuable natural resource involved in *Burford*, solvent and healthy insurance coverage is an essential state concern.'")

- 20 -

Accordingly, the Rehabilitator's Cross-Motion should be granted, either dismissing or staying this Adversary Proceeding in deference to the Illinois rehabilitation court as mandated by McCarran-Ferguson.

## POINT II

### Ames' Jurisdictional Arguments Are Without Merit

Ames' Jurisdiction Motion, brought in reaction to the filing of the Rehabilitation Order, is a flagrant effort to convert what are nothing but disputed, general unsecured claims by Ames against Lumbermens, into secured claims to the extent of the $8 million of Lumbermens' assets residing in a trust account at the Bank of New York. In its effort to escape the rehabilitation process and "jump the line" of creditors seeking distribution from Lumbermens' estate under the priorities set forth in the Illinois Insurance Code, Ames mis-states the underlying facts and mischaracterizes prior proceedings in the Bankruptcy Court. The centerpiece of these arguments is Ames' contention that the Trust Monies themselves have somehow become "property of the estate," through a magical transformation, *ipse dixit*. Even in the Bankruptcy Court, the burden is upon the Trustee/Debtor to prove that the Trust Monies are property of its bankruptcy estate within the meaning of 28 U.S.C. § 1334(e) (2006). *See, e.g.*, *Voiland v. Tipsword* (*In re Troy Jenn Inc.*), 2006 Bankr. LEXIS 1632 (Bankr. N.D. Ill. June 30, 2006) ("The burden of proof in a turnover proceeding is on the trustee, and the trustee must prove that the property in question is part of the bankruptcy estate.").

Ames has utterly failed to meet this burden, or to demonstrate that Ames currently has, or ever had, any property rights or interests in the assets of Lumbermens that Lumbermens, as Grantor, deposited in Trust with the Bank of New York, as Trustee under a formal Trust Agreement, for the exclusive benefit of Travelers in 2003. Moreover, Ames has failed to cite any right or power that was granted to the Bankruptcy Court to divert the undrawn Trust Monies away from the Rehabilitator, to whom they must be returned under the terms of the Bond, the Letter Agreement and the Trust

Agreement itself.  Finally, Ames has failed to demonstrate that the Bankruptcy Court has ever

exercised any jurisdiction over the corpus of the Trust, or has "exclusive" jurisdiction over the claims

Ames asserts against Lumbermens in this Adversary Proceeding, or that Lumbermens ever consented

to such jurisdiction.  To the contrary, each Bankruptcy Court order that has mentioned the Trust

Monies has consistently preserved all jurisdictional objections of Lumbermens.

In all the circumstances, including that Ames has no valid basis for alleging it has any property

interest in any of the Trust Monies, Ames should be directed to pursue its claims against Lumbermens

in the Illinois state court, and this Adversary Proceeding should be dismissed or stayed in deference to

the Illinois state court rehabilitation proceedings.

### A.    The Bankruptcy Court Does Not Have Exclusive Jurisdiction

The Bankruptcy Court and the District Court are courts of limited jurisdiction.  Federal

bankruptcy jurisdiction is "exclusive" only over bankruptcy "cases under title 11" (28 U.S.C. § 1334 ).

Federal bankruptcy jurisdiction is "not exclusive" regarding disputes "arising from" or "related to" a

bankruptcy case (*id.* § 1334(b)); accordingly, such disputes may be heard not only by a Bankruptcy

Court or District Court, but also by other tribunals (such as arbitrators, administrative bodies, state courts

of general or limited jurisdiction, and even tribunals in foreign countries).  Furthermore, as was observed

by the U.S. Supreme Court in *Stern v. Marshall*, 564 U.S. 2 (2011), the current bankruptcy system

"permits the district court to withdraw from the bankruptcy court any referred case, proceeding, or part

thereof," 564 U.S. 2 at __, 131 S. Ct. 2594, 2620 (2011), and "Section 1334(c)(1) similarly provides that

bankruptcy courts may abstain from hearing any proceeding, including core matters, 'in the interest of

comity with State courts or respect for State law.'" *Id.*  Thus, Ames' argument that the Bankruptcy Court

has "exclusive jurisdiction" over various discrete aspects of this Adversary Proceeding is simply

unfounded.[42]

Ames' own pleadings from the outset of this Adversary Proceeding confirm that this dispute did

not arise from any allegation of "ownership" or "lien" or other "property interest" claimed by Ames in

the Trust Monies.  Ames initially filed this Adversary Proceeding, in 2006, as a declaratory judgment

action primarily targeting Travelers, arguing that Travelers was "overcollateralized", given the combined

$42,542,500 value of the Lumbermens Bond ($14,350,000) and the two letters of credit ($28,192,500)

Travelers was holding.  Ames' initial Complaint sought to determine how much of Travelers' collateral

was in fact "excess", and sought an order compelling Travelers to release the "excess collateral" (a term

Ames has more recently used in this proceeding, out of context, to incorrectly describe the Bond or the

Trust Monies).

The 2007 and 2008 Motion Proceedings Did Not
Involve Jurisdictional Findings As To The Trust Funds

The two prior motions to which Ames makes reference similarly did not involve any assertion of

any property right or ownership interest by Ames in the Trust Monies.  By motion filed in 2007 (Ames'

"2007 Motion"), Ames secured Bankruptcy Court approval for Travelers' release of one of the two

letters of credit, and for Travelers' consent to the reduction of the second letter of credit to an amount

---

[42] Ames' reference to *Luan Inv. S.E. v. Franklin 145 Corp.* (*In re Petrie Retail, Inc.*), 304 F.3d 223 (2d Cir. 2002), is not relevant to the current issues. Regarding the *Petrie* decision, the Second Circuit later stated in *Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 449 (2d Cir. 2005), as is applicable here, "Because *Petrie* addressed a specific factual situation that demonstrated the dispute's unique effect on a reorganization in bankruptcy court and because none of the factors *Petrie* emphasized is present in this case, *Petrie* is not relevant."
Ames cites *Strong v. W. United Life Ass. Co.* (*In re Tri-Valley Distr., Inc.*), 350 B.R. 628, 2006 WL 2583247 (2006) (10th Cir. B.A.P. 2006), *appeals dismissed*, 533 F.3d 1209 (10th Cir. 2008)" (Ames' Memo., p. 25).  The true holdings in that case were summarized by the District Court in its subsequent decision in *Strong v. W. United Life Assur. Co., 2011 U.S. Dist. LEXIS* 5444, 2–3 (D.Utah Jan. 19 2011).  In the *Strong* decisions, the Bankruptcy Court retained jurisdiction over that portion of the adversary proceeding pertaining to the property that belonged to Debtors on the date the bankruptcy petition was filed, but abstained under McCarran-Ferguson as to the remaining claims against the insolvent insurer.  The BAP "determined that the bankruptcy court erred in its conclusion that the McCarran-Ferguson Act applied to those claims and thus provided a basis for dismissal", but affirmed the dismissal on the basis that 28 U.S.C. § 1334(c)(1) provides for permissive abstention in any proceeding under title 11, "in the interest of justice, or in the interest of comity with state courts or respect for State law".  *Strong v. W. United Life Assur. Co.* (*In re Tri-Valley Distrib.*), 533 F.3d 1209, 1216 (10th Cir. 2008).  Thus, even if this Court were to find *Strong* controlling, Lumbermens asserts that since the Trust Monies clearly were not the property of Ames at the time its petition was filed (inasmuch as the Trust Monies did not even exist at that time), and were never conveyed to Ames' estate, the federal court should abstain from hearing the Adversary Proceeding, and should dismiss it, under 28 U.S.C. § 1334(c)(1) , even if it finds McCarran-Ferguson inapplicable.

that Travelers agreed would be sufficient to secure Ames' remaining obligations to Travelers

($13,350,000).  The Bankruptcy Court grounded its determination, in part, on its finding that the

reduced, remaining letter of credit would still be sufficient to protect Lumbermens' right to seek

enforcement of its Letter Agreement with Travelers, since Travelers had agreed that the total remaining

obligations were less than the amount of the reduced, remaining letter of credit.

Then, in 2008, Ames reached a "final settlement" with Travelers (to pay Travelers $6,511,508,

out of the remaining letter of credit), which was approved by the Bankruptcy Court over Lumbermens'

objection, in an order whose terms were agreed upon by counsel for Ames, Travelers, and Lumbermens

(the aforesaid "2008 Order").  The 2008 Order explicitly preserved all of the parties' positions regarding,

among other things, "the interpretation of the Letter Agreement and the jurisdiction of this court to hear

and dispose of matters involving the Letter Agreement, the Bond or the Trust Monies" (Gamell Aff. Ex.

AA, Ames' Memo., Exh. G, p. 3).

Ultimately, Ames' positions refute themselves.  For example, Ames' Memorandum argues at

page 6 that "the Bankruptcy Court has already exercised its *in rem* jurisdiction over the Trust

Monies . . . .", but Ames' Memorandum admits at page 3 that the 2008 Order reserved "all rights and

arguments to the Trust Monies as if Ames' settlement with Travelers had never occurred."

Similarly, no "*in rem*" jurisdiction over the Trust Monies was exercised by the Bankruptcy Court

in relation to the 2007 Motion filed by Ames.  In granting Ames' 2007 Motion, the Bankruptcy Court

merely confirmed that Travelers had the right, under Travelers' own agreements with Ames, to select the

order in which Travelers would draw on collateral, in Travelers' complete discretion.[43]  The Court then

ruled that since Lumbermens was not immediately harmed by Travelers' stipulation with Ames (and

Lumbermens' rights against Travelers were being preserved in the event any damages could later be

proven by Lumbermens against Travelers), the Court would approve the partial settlement stipulation

---

[43] See November 5, 2007 Transcript, Gamell Ex. X, at Tr. 46:.11 – 15. *See also* comments of Committee counsel at Tr.
18:18-20 ("Travelers has a right to call upon whichever pot it needed . . .")

between Ames and Travelers. Neither the Court's ruling, nor the partial settlement stipulation between

Ames and Travelers, contained any disposition of the Trust Monies whatsoever. To the contrary, the

Court stated as follows regarding the Letter Agreement which settled the bond claim of Travelers against

Lumbermens (referring to Lumbermens by its former trade name "Kemper"): "*I do not have jurisdiction*

*over the dispute between two non debtors, Kemper and Travelers, concerning the terms of the bond*

*agreement or their subsequent letter agreement.*" *(emphasis added*; Ames. Memo, Exh. C., at Tr. 46:8-

12). The Bankruptcy Court further stated as follows (Gamell Aff. Ex. X, Ames. Memo, Exh. C., at Tr.

49:4-22):

> Finally, Kemper's interest cannot possibly be considered prejudiced because the remaining
> letter of credit being held by Travelers will have a value equal to Ames' maximum
> liabilities under the insurance program as will be represented by Travelers in this
> stipulation. * * * To the extent that Kemper believes it has a contractual right to have other
> sources of collateral drawn upon before any of its bond or trust monies are used, and I
> express no opinion on the merits of that argument, Kemper is in no way prejudiced by this
> stipulation from pursuing that claim. I'm not at all sure that I would have jurisdiction over
> a Travelers/Kemper dispute in this regard but each side can have a reservation of rights as
> to that as well. Kemper is of course right that Ames has no interest in the surety bond and
> that neither the bond nor the letters of credit are property of the Ames estate. This decision
> assumes the correctness of those assertions.

Ames' Memorandum is incorrect and grossly misleading when it argues (at page 11) that the

Bankruptcy Court held it had *in rem* jurisdiction over the Trust Monies, at the hearing on Ames' 2007

Motion. Nothing in the transcript so held. The comments of the Court in the transcript, quoted by Ames

at page 11 of Ames' Memorandum, were referring to *in rem* jurisdiction over "cash posted as collateral

to secure Wachovia's obligations under the letters of credit" (not the Bond or the Trust Monies). Thus, it

was Ames' estate's cash securing the letters of credit over which the Bankruptcy Court noted it had *in*

*rem* jurisdiction, *not* Lumbermens' assets that had been placed in the Trust. (*See* Gamell Aff. Ex. X,

November 5, 2007 Transcript at 50:5-9).

The Legal Authorities Cited by Ames For The Alleged "Exclusive
Jurisdiction" Of The Bankruptcy Court Do Not Support Its Arguments

There is no merit to Ames' argument that "the Bankruptcy Court also has exclusive jurisdiction

to determine whether or not property constitutes property of the estate" (Ames' Memo. p. 16).   Ames

cites two cases alleged to support this assertion, *Mata v. Eclipse Aerospace, Inc.* (*In re AE Liquidation,*

*Inc.*), 435 B.R. 894, 904 (Bankr. D. Del. 2010), *leave to appeal denied* 451 B.R. 343 (D.Del. 2011); and

*Kraken Inv. Ltd. v. Jacobs* (*In re Salander-O'Reilly Galleries, L.L.C.*), 475 B.R. 9, 28–30 (S.D.N.Y. July

9, 2012).   Neither decision supports Ames and, instead, both decisions support Lumbermens' position

that the Bankruptcy Court's jurisdiction, if any, is not exclusive.

In *AE Liquidation,* the only question was as to whether certain assets, at one time owned by the

debtor, were still owned by the debtor's estate at the time the estate sold all its assets in a bulk asset sale.

There was no issue as to whether the debtor "ever" owned the assets (as is present here).   Bankruptcy

Judge Walrath merely found she had jurisdiction to determine whether the estate's assets were, or were

not, included in the scope of the sale order (*i.e.,* whether they were still property of the estate at the time

of the sale, or whether title had been transferred to the debtor's customers before the sale had occurred).

That finding has no application where, as here, the debtor never had a property interest in the assets at

issue.

More pertinent to the current motion is that the Court in *AE Liquidation* also ruled that "the party

invoking the federal court's jurisdiction bears the burden of establishing the court has jurisdiction" (435

B.R. at 900).   On the current motion, Ames has failed to demonstrate any basis for the Bankruptcy Court

to exercise jurisdiction over the Trust Monies (such as any colorable basis of Ames' alleged ownership

of the Trust Monies).

In the second case relied upon by Ames, *Salander,* the Bankruptcy Court discussed whether it

had "core" jurisdiction (not "exclusive" jurisdiction).   To the extent *Salander* addressed "exclusive"

jurisdiction at all, the Court ruled the Bankruptcy Court had "arises under" jurisdiction (which, by

definition, is "original but not exclusive jurisdiction" (28 U.S.C. § 1334(b) ).  *Salander* therefore

supports Lumbermens' position, not Ames'.

Also, the *Salander* court noted that the parties had not briefed any Second Circuit caselaw

addressing whether the determination of what constitutes the bankruptcy estate is a core proceeding.

Nevertheless, such decisions do exist.  Mostly they have held that issues as to whether an asset is or is

not property of the estate, do not even create "core" jurisdiction, (much less "exclusive" jurisdiction).

As Chief Bankruptcy Judge Bernstein stated in *Penthouse Media Group v. Guccione* (*In re Gen. Media,

Inc.*), 335 B.R. 66, 76 (Bankr. S.D.N.Y. 2005), "If an ownership dispute must be resolved before any

relief can be ordered, the proceeding is a non-core replevin action under state law rather than a §542(a)

turnover proceeding." [44]

Nor is Ames' position advanced by its references to *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356

(2006), or *Matter of Rimsat, Ltd.*, 98 F.3d 956 (7th Cir. 1996).  Neither decision holds that a Bankruptcy

Court has exclusive jurisdiction to determine disputes as to what is, in fact, the debtor's property.

---

[44] Accord:  *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc.* (*In re Andrew Velez Constr., Inc.*), 373 B.R. 262, 273 (Bankr. S.D.N.Y. 2007) ("Because a disputed debt is not property that the trustee can use, sell or, lease, §542(a) is inapplicable.");  *Savage & Assocs. v. Mandl* (*In re Teligent, Inc.*), 325 B.R. 134, 138 (Bankr. S.D.N.Y. 2005) ("the plaintiff has not identified property of the estate that is subject to turnover");  *Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd.* (*In re Seatrain Lines*), 198 B.R. 45, 50 (S.D.N.Y. 1996) (Sotomayor, J.), "It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute.");  *Hassett v. BancOhio Nat'l Bank* (*In re CIS Corp.*), 172 B.R. 748, 756, 757 (S.D.N.Y. 1994) ("in substance and spirit the Trustee's action is fundamentally an action to determine disputed *ownership* in property. Such an action arises under state law [citation omitted], and is independent and outside the reach of the bankruptcy process [citation omitted]") (emphasis in original); *cf.*, *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1102 (2d Cir. 1993) (treating collection of a disputed pre-petition account receivable as "core" "creates an exception to *Marathon* that would swallow the rule").  In regard to other circuits, *see, e.g.*, *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1991) ("the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute"); *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir. 1990) ("Turnover proceedings are not to be used to liquidate disputed contract claims."); *Berks Behavioral Health, L.L.C. v. St. Joseph Reg'l Health Network* (*In re Berks Behavioral Health, L.L.C.*), 464 B.R. 684, 690 (Bankr. E.D. Pa. 2012) ("Numerous courts have held that a turnover is not proper where a bona fide dispute exists."); *Flagship Hotel, Ltd. v. City of Galveston* (*In re Flagship Hotel, Ltd.*), 2007 Bankr. LEXIS 550 (Bankr. S.D. Tex. Feb. 16, 2007) ("The Bankruptcy Court will not enforce a debtor's claim through turnover orders unless the claim against the defendants is litigated in a court of competent jurisdiction or by agreement."); *Rafool v. GMAC* (*In re Goulding*), 2003 Bankr. LEXIS 1126 (Bankr. C.D. Ill. Sept. 10, 2003) ("Turnover is not intended as a remedy to determine disputed rights of parties to property, rather it is intended as the remedy to obtain what is acknowledged to be property of the bankruptcy estate.").

Ames also cites two cases that sought "excess collateral after application of letters of credit",

*In Int'l Fin. Corp. v. Kaiser Group Int'l Inc.* (*In re Kaiser Group Int'l Inc.*), 399 F.3d 558, 566 (3d Cir.

2005) and *First Ave. W. Bldg., L.L.C. v. James* (*In re Onecast Media*), 439 F.3d 558, 564 (9th Cir.

2006), and implies that these cases are somehow analogous to the instant matter, when they clearly are

not. Ames did not post *any* collateral with Lumbermens, unlike the debtors in those two decisions. And

there is in fact no "excess collateral" involved in the Trust Monies, as the assets of Lumbermens in the

Trust have never been drawn upon by Travelers and remain *in custodia legis*. Thus, those two decisions

are irrelevant, except to highlight why Ames' position is distinguishable, as well as unsupportable on the

facts.

Ames' Memorandum next cites *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–05

(1983), another case having no similarity to this Adversary Proceeding. Like many of the cases Ames

cites, *Whiting* involved an ongoing reorganization effort. The Court simply held that monies of the

debtor that had been levied upon and seized by the IRS had not yet become property of the IRS, and thus

continued to be property of the estate, so they were subject to turnover provided the debtor furnished

adequate protection to the IRS. *Whiting* therefore furnishes Ames no support for its arguments. Rather,

*Whiting* instructs that even if Ames did have a property interest in the Trust Monies, any turnover order

would have to be conditioned upon Ames furnishing Lumbermens adequate protection to protect

Lumbermens' own rights (which Ames could not furnish, and which is a moot issue in any event

because Ames has long since publicly abandoned all efforts to seek reorganization).

Ames' reliance on *In re Chateaugay Corp.*, 116 B.R. 887 (Bankr. S.D.N.Y. 1990) is also

misplaced. That particular *Chateaugay* decision also related to a debtor's reorganization efforts (which

Ames had abandoned before the current dispute arose). Also, *Chateaugay* involved surety bonds that

entitled the debtor's employees to make claim directly against the surety for their workers compensation

benefits, whereas the Lumbermens Bond was for the sole benefit of Travelers. Indeed, in relation to the

- 28 -

facts of this Adversary Proceeding, the Court's analysis in *Chateaugay* applies not so much to Ames'

relationship to Lumbermens as it does to Ames' relationship with Travelers, *i.e.*, Travelers guaranteed

Ames' workers compensation obligations to Ames' employees and granted those employees the direct

right to make claim against Travelers (despite that Ames itself was responsible to hold Travelers

harmless from and reimburse Travelers for the first $500,000 of any such claim, as a "high deductible"

or "self-insured retention").[45]

Ames' citation of *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993) (referring to "the reach of

§541") is similarly flawed. *Bankruptcy Code* § 541 (?YEAR?)sets forth the seven categories of

"property" of which a bankruptcy debtor's "estate is comprised". None of those categories apply to the

Trust Monies. Stated differently, Ames had the burden to plead, and to come forward with evidence

establishing, at least on a prima facie basis, that the Trust Monies fall into one of the seven categories

described in Bankruptcy Code §541 and also that the Trust Monies meet the definition of "property of

the estate" set forth in 28 U.S.C. § 1334(e) . Ames has not done so.

Ames' discussion of *Yonikus* also overreaches by incorrectly equating and confusing "core"

proceedings with Bankruptcy Court "exclusive jurisdiction" (Ames' Memo., p. 18). The two are clearly

very different concepts. The last case Ames cites, *McRaith v. Am. Re-Insurance Co., 2010 U.S. Dist.

LEXIS* 14, 021 (N.D. Ill. Feb. 17 2010), has no bearing on this motion, since it involved neither a

bankruptcy matter nor an affirmative claim by a bankruptcy debtor against an insolvent insurer or its

assets.

Ames' Arguments Based Upon An Alleged Violation Of The Automatic
<u>Stay Do Not Support Exclusive Jurisdiction In The Bankruptcy Court</u>

Ames' arguments for grounding "exclusive" bankruptcy court jurisdiction on Ames' allegation

---

[45] In regard to such "high deductible" and "self-insured retention" programs, Travelers was in fact a surety for Ames, in favor of Ames' employees (as beneficiaries or obligees). *See, e.g., Air Liquide America Corp. v. Continental Casualty Co. v. CIGNA Property & Casualty Co., 217 F.3d* 1272 (10th Cir. 2000); *Cincinnati Ins. Co. v. Torok,* 787 N.E.2d 1257 (Ohio Ct. App. 2003) (Ohio App. 7 Dist. 2003). Thus, unlike the situation in *Chateaugay,* there was no cessation of benefits to Ames' employees, even temporarily, since the benefits were being advanced by Travelers.

that Lumbermens violated the automatic stay is similarly baseless. Ames' argument relies on *In re Ionosphere Clubs, Inc.*, 124 B.R. 635 (S.D.N.Y. 1991), but that decision has been undermined by the Second Circuit's more recent decision in *MBNA Am. Bank v. Hill*, 436 F.3d 104 (2d Cir. 2006), which rejected a debtor's contention that it could only pursue relief for violation of the automatic stay in a Bankruptcy Court. The Second Circuit further held in *MBNA* that especially where (as here) no ongoing reorganization of the debtor was involved, and only interpretation of the automatic stay statute was involved, the automatic stay violation claim could be determined by an arbitrator rather than the Bankruptcy Court. *Id.* at 109–11.[46]

Furthermore, Ames' citation to 28 U.S.C. § 157(b)(2)(G) is unavailing, as that subsection designates as core proceedings only "motions to terminate, annul, or modify the automatic stay". It does not make "enforcement" of the automatic stay a "core proceeding".

The Trust Monies Are Not "Property Of The Estate" Of Ames

Under 28 U.S.C. § 1334(e), "property of the estate" is comprised of only two things: (1) property interests owned by the debtor when the petition was filed (on August 20, 2001), and (2) assets acquired post-petition by the debtor (after August 20, 2001). In 2001, when Ames filed its chapter 11 petition, the Trust and Trust Monies did not exist. At that time, in 2001, Ames had no property interest in any of Lumbermens' money, or in any of Lumbermens' "general assets", or in the Bond or its proceeds. Ames never acquired any such interest in the two years that followed. In 2003, the Trust was created, and Lumbermens deposited its own cash in the sum of $8,000,000 from its own general assets into the Trust Account. Ames was never granted, conveyed, assigned, or transferred any property interest in the Bond, its proceeds or the Trust Monies.[47]

---

[46] *Ionosphere* has also been distinguished because, unlike the instant Ames case, it dealt with an ongoing effort to reorganize. *See, e.g.*, *Putnam Cnty. Sav. Bank v. Bagen* (*In re Bagen*), 185 B.R. 691, 700 (Bankr. S.D.N.Y. 1995) ("Although the court in *Ionosphere Clubs, Inc.* refrained from abstaining, that court was handling a complex reorganization of a national corporation [***]. Clearly, that rationale does not apply to this proceeding.").

[47] In *Werbungs und Colmmerz Union Austalt v. Collectors' Guild, Ltd.*, 147 B.R. 317 (S.D.N.Y. 1992), the Court ruled that a

- 30 -

The Trust Monies therefore are not "property of the estate" under 28 U.S.C. § 1334(e), and thus are not subject to *in rem* jurisdiction in the Bankruptcy Court. At most, Ames has only a general unsecured claim against Lumbermens. In fact, the Bankruptcy Court's 2007 holding that the Bond was not property of the estate forecloses the estate from now arguing that the Bond or its proceeds constitute property of the estate.

Neither Ames' Adversary Complaint Nor Its Prior Motions
Asserted That The Trust Monies Were Property of the Estate

Ames has never even pleaded that the Trust Monies are assets of the Ames estate, or that Ames has any property interest in the Trust Monies. Instead, Ames' Second Amended Complaint asserts a series of general unsecured claims against Lumbermens — none of which is viable under either the facts or the applicable law (and none of which contends that the Trust Monies constitute an asset of Ames' bankruptcy estate).[48]

In its 2008 Motion seeking approval of Ames' final settlement with Travelers, Ames did ask the Court to direct that $6,511,508 of the $8,000,000 in Trust Monies be paid to Ames. Ames' request for that relief was limited to a request for an order "directing that the portion of the Trust Monies, represent [*sic*] the amount equal to the Allowed Claim Amount, be released and turned over to the Debtors . . . ." (Gamell Aff. Ex. HH, at ¶*50*). The "Allowed Claim Amount" was the amount of Ames' final settlement with Travelers (*i.e.*, $6,511,508, not $8,000,000) (Gamell Aff. Ex. HH, at ¶¶*1, 40*). At ¶40 of Ames' 2008 Motion, Ames requested that the Court direct <u>Travelers</u> to pay Ames a sum equal to the $6,511,508 "Allowed Claim Amount" of Travelers' claim out of the Trust Monies, as

---

bond issued on behalf of the debtor was not property of the estate, that the trustee had no power to enter into a settlement agreement calling for a creditor to be paid exclusively from the proceeds of the bond, and that the Bankruptcy Court "did not have the authority" to approve of such a settlement agreement (*id.* at 323). *See also Sutton v. Hay*, 9 F.2d 795 (7th Cir. 1925); *Big Idea Liquidating Creditor Trust v. Safeco Ins. Co. of Am.* (*In re Big Idea Prods.*), 372 B.R. 388, 398-99 (Bankr. N.D. Ill. 2007); *Duplitronics, Inc. v. Concept Design Elecs. & Mfg.* (*In re Duplitronics, Inc.*), 183 B.R. 1010, 1015 (Bankr. N.D. Ill. 1995); *Keene Corp. v. Acstar Ins. Co.* (*In re Keene Corp.*), 162 B.R. 935, 942 (Bankr. S.D.N.Y. 1994).
[48] There was a claim asserted for "turnover" under 11 U.S.C. § 542, but that related solely to collateral that was held by Lumbermens' affiliate for customs bonds issued for Ames, and that claim has been dismissed as part of a stipulated settlement.

follows:

> Moreover, the Debtors submit that the Court may enter the Collateral Release Order as
> proposed, including a direction to Travelers that a portion of the Trust Monies equal to the
> Allowed Claim Amount be released to the Debtors at this time, and that such a result would
> be fair and equitable.[49]

The Bankruptcy Court never ruled on this request, as the 2008 Motion was resolved in an

agreed-upon Order (the "2008 Order"). The 2008 Order stated that Ames' request regarding the Trust

Monies is "to be determined as part of the Adversary Proceeding" (Gamell Aff. Ex. AA, *2008 Order,*

*Ames' Juris. Motion, Exh. G, p. 3*), and preserved all of the parties' positions (including as to "the

jurisdiction of this court to hear and dispose of matters involving the Letter Agreement, the Bond or the

Trust Monies"). Specifically, the 2008 Order stated in relevant part as follows:

> ORDERED that portion of the Motion which sought the release and turnover to Ames of
> the Trust Monies is reserved and deferred, as still pending, to be determined as part of the
> Adversary Proceeding in such procedural format as this Court may determine, and
> Travelers shall continue to hold the Trust Monies in accordance with the Letter Agreement
> and the trust established pursuant to the Letter Agreement, provided however, that Debtors
> and Lumbermens fully reserve their respective arguments, positions, claims and defenses
> regarding the interpretation of the Letter Agreement and the jurisdiction of this court to hear
> and dispose of matters involving the Letter Agreement, the Bond or the Trust Monies;

The 2008 Order also explicitly reserved and preserved, among other things, Lumbermens' own

rights against Travelers, and the positions of both Lumbermens and Ames as against each other in this

Adversary Proceeding (subject to certain caveats in relation to Ames' settlement with Travelers, which

was agreed not to "affect" the rights of Ames and Lumbermens as against each other).[50] Accordingly,

the Bankruptcy Court clearly did not assert *in rem* jurisdiction over the Trust Monies in connection

with its 2008 Motion.

---

[49] Ames' 2008 Motion further stated in part, at ¶8, "No additional funds will be released to the Debtors as a result of the
entry of the Approval Order." Ames thereby made it clear the 2008 Motion was not seeking the remaining $1,488,492 of the
$8,000,000 in Trust Monies over and above its $6,511,508 settlement with Travelers. Gamell Aff. Ex. AA.

[50] Gamell Aff. Ex. AA.

POINT III

Ames' Arguments Regarding the "Letter Agreement" Are Without Merit

A.    The Letter Agreement Is A Valid Exercise By
      Two Creditors Of Rights Granted to Them By Ames

As discussed above, the Bankruptcy Court held in 2007, and the relevant documents provide,

that Travelers had the discretion under its agreements with Ames to draw upon whichever collateral it

wished in whatever order it chose.  As also discussed above, the Indemnity Agreement executed by

Ames in favor of Lumbermens granted Lumbermens the right to agree to changes in the Bond, or the

bonded contract, and permitted Lumbermens to settle bond claims under such terms as Lumbermens

determined were in Lumbermens' interests, in Lumbermens' discretion.[51]

Therefore, in the Letter Agreement of November 4, 2003 by which Travelers and Lumbermens

settled their dispute regarding Travelers' demand under the Bond, Lumbermens and Travelers each

exercised the rights Ames had granted to them for their respective benefit.  Put another way, Travelers

had absolute discretion as to which of its collateral it would look to first, and it exercised that discretion

as part of an agreement with Lumbermens that Travelers found satisfactory.  Ames cannot "void" that

agreement, or collaterally attack it, merely because Ames feels the two non-debtor parties did not craft

an agreement between themselves that would bring about the best financial result for Ames or its

creditors.

B.    The Letter Agreement Is Not "Void," But Even
      If It Were No Trust Monies Would Flow To Ames

There is no merit whatsoever to Ames' contention that the Letter Agreement between

---

[51] It is well established that such clauses are valid and binding upon the bond principal, that such settlements are enforceable, and that the bond principal is bound by the surety's settlement with the bond claimant for purposes of the surety's relationship with the bond principal.  See, e.g., *Hutton Constr. Co. v. Cnty. of Rockland*, 52 F.3d 1191 (2d Cir. 1995);  *Gen. Accident Ins. Co. of Am. v. Merritt-Meridian Constr. Corp*, 975 F. Supp. 511, 519 (S.D.N.Y. 1997);  *Banque Nationale de Paris S.A. v. Ins. Co. of N. Am.*, 896 F. Supp. 163 (S.D.N.Y. 1995);  *PSE Consulting, Inc. v. Frank Mercede & Sons*, 267 Conn. 279, 838 A.2d 135 (2004); *Travelers Cas. & Sur. Co. of Am. v. Caridi, 2012 Conn. Super. LEXIS* 1083 (Conn. Super. Ct. Apr. 19 2012).

Lumbermens and Travelers which settled Travelers' Bond Demand is "unenforceable," as having been "entered into in violation of the automatic stay." Ames has not cited any authority for its contention that the stay prohibited Travelers and Lumbermens, as two mutual creditors of a bankruptcy "debtor", from entering into an agreement settling their differences as between themselves based upon their exercise of rights Ames had granted to each of them in writing, and which made no material change to the pre-existing provisions of the operative documents.

In any event, Ames' contention makes no sense. The Trust Monies did not even exist until Travelers and Lumbermens executed the Letter Agreement. The Letter Agreement contained the agreement by Travelers and Lumbermens to create the Trust Agreement, establish the Trust at the Bank of New York, and have it funded with $8 million from Lumbermens' general assets. Accordingly, it is almost impossible to discern the logic behind Ames' argument that if the Letter Agreement is void, the Trust Monies created under the Letter Agreement should be paid over to Ames. If the Letter Agreement were to be declared "null and void," the *status quo ante* would be restored; that is, the Trust Monies would revert to Lumbermens. The relief Ames is demanding would thereby defeat Ames' own claim.

Ames had available to it for years every tool necessary to immediately address the situation if it felt that the Letter Agreement truly trampled on any of its legitimate rights. It would be grossly inequitable to permit Ames to argue that the Letter Agreement is void after allowing the parties to the Letter Agreement to rely upon its terms since 2003; Ames' own silence and inaction while it continued to pay its obligations to Travelers, in pursuit of its own business decision to negotiate for five years with Travelers, should bar this collateral attack on the Letter Agreement by an entity that was not even a party to it.

C.     Ames Was Not Damaged By The Letter Agreement

Ames suffered no damage to its estate resulting from the Letter Agreement. Ames applied to

the Bankruptcy Court for relief regarding the Letter Agreement on one occasion (the 2007 Motion).

The Court granted Ames the relief it requested, that is, the Court exercised its authority to permit

Travelers, as an overcollateralized creditor, to release excess letter of credit collateral, thus avoiding

any damage to the estate while carefully preserving the rights of the parties to the Letter Agreement,

including Lumbermens' potential right to seek damages against Travelers as a result.  Ames has

offered no other proof of any alleged damage.  Neither Ames nor its general creditors were the obligee

or beneficiaries of the Bond.

In any event, Ames remained liable under its agreements with Travelers to make payment of all

amounts for which it was obligated, as such obligations became due.  Travelers had the unfettered right

to draw down upon the letters of credit if Ames defaulted in its payment obligation, whether or not

Travelers also held any Bond Collateral from Lumbermens.  No agreement has been produced pursuant

to which Travelers' rights in this regard was in any way restricted.  Any argument by Ames that a

different financial result would have occurred had the Letter Agreement not been entered into is pure

speculation as to what Travelers might, or might not, have done in different circumstances, and does

not form a proper, non-speculative  basis for the award of any damages against Lumbermens.

> D.     The Letter Agreement Did Not Grant The Court Power To Rewrite
>        Its Terms Or Those Of The Trust Agreement For Ames' Benefit

There is no merit to Ames' contention, citing ¶ 6 of the Letter Agreement (*Ames' Memo, p. 19*),

that "Lumbermens expressly consented to a disposition of the Trust Monies by 'the Bankruptcy Court

overseeing Ames' bankruptcy case (or other court or authority with competent jurisdiction).'"  The

actual language of the Letter Agreement between Travelers and Lumbermens makes it clear that the

relief Ames is seeking is beyond the scope of the Letter Agreement, the jurisdiction of this Court, and

any judicial power which could fairly be said to have been acknowledged by the Letter Agreement

itself.  No provision of the Letter Agreement granted jurisdiction to the Bankruptcy Court to issue a

declaratory judgment substantially revising the terms of that agreement, entered into by the two non-

debtors, Travelers and Lumbermens.

The paragraph of the Letter Agreement relied upon by Ames ("¶ 6") only addresses how "Travelers may return the *unapplied proceeds*", *i.e.*, it only contemplates an order directing Travelers (and not Lumbermens) to return "unapplied proceeds" received by Travelers, and to return such proceeds in a manner other than as provided in ¶ 5 of the Letter Agreement.[52]   No such "unapplied proceeds" of the Trust or the Bond exist.   To be unapplied proceeds under the Letter Agreement, Travelers must have "received" the proceeds.   Simply put, Travelers does not have any "unapplied proceeds," as that term is used in the Letter Agreement, as Travelers never received any money from Lumbermens or from the Trust.

Furthermore, ¶ 6 of the Letter Agreement only contemplated an order directing how "Travelers may return the unapplied proceeds" (emphasis added).   It does not authorize an order directing Lumbermens to do anything (much less an order directing Lumbermens to pay someone something). There is certainly nothing in the Letter Agreement granting advance consent to any court's rewriting of the terms of the Letter Agreement or the Trust Agreement, whether for Ames' benefit or otherwise. Thus, the relief sought by Ames is simply not contemplated or authorized under the paragraph of the Letter Agreement relied upon by Ames.

> E.     Lumbermens' Rights Of Equitable Subrogation Would Have Yielded
> The Same Result to The Estate In the Absence of the Letter Agreement

Ames has also failed to demonstrate how the Ames estate was damaged, after taking into account Lumbermens' rights of equitable subrogation.[53]

Had the Bond been drawn upon first by Travelers, as Ames contends (without authority) should

---

[52] The Letter Agreement language actually states, at ¶6: "Travelers may return the unapplied proceeds in accordance with the order of the Bankruptcy Court overseeing Ames' bankruptcy case (or other court or authority with competent jurisdiction) that directs a different return or other disposition of the proceeds of the Collateral."   Gamell Aff. Ex. E.
[53] As noted above, Lumbermens had defenses to Travelers' full penal sum Bond Demand, and the proceeds of a full penal sum demand were required by the Bond to have been held as "collateral" by Travelers rather than applied immediately to Ames' obligations.

have occurred, Lumbermens would have become subrogated to Travelers' rights against the LOCs,

under 11 U.S.C. § 509(a); *see In re Wingspread Corp.*, 116 B.R. 915, 931 (S.D.N.Y. 1990). As was

held in *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136–37 (1962), "there are few doctrines better

established than that a surety who pays the debt of another is entitled to all the rights of the person he

paid to enforce his right to be reimbursed. This rule is widely applied in this country and generally

known as the right of subrogation . . . ." Subrogation is recognized in the Bankruptcy Code in 11

U.S.C. § 509(a), "Claims of Codebtors", which provides that "an entity that is liable with the debtor on,

or has secured, a claim of a creditor against a debtor, and that pays such a claim, is subrogated to the

rights of such creditor to the extent of such payment." 11 U.S.C. § 509(a). Surety subrogation rights

are also recognized under the state law of Connecticut, which governs the Bond. *Balboa Ins. Co. v.

Bank of Boston Conn.*, 702 F. Supp. 34 (D. Conn. 1988); *Nationwide Mut. Ins. Co. v. R & S Assoc.*,

*1992 Conn. Super. LEXIS* 2779 (Conn. Super. Ct. Sept. 18 1992). In a bankruptcy context, the

subrogation rights of a surety were described as follows in *In re Wingspread Corp.*, 145 B.R. 784,

787–88 (S.D.N.Y. 1992), *aff'd* 992 F.2d 319 (2d Cir. 1993):

- "Among the oldest ... [equitable doctrines] is the rule of subrogation whereby one who has been compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other."

- "payment in a technical sense [was not] required to subrogate a claim."

- "§509 provides that the co-debtor is subrogated to the 'creditor's *rights*,' not just the creditor's claims."

Included within the scope of the subrogation to which the surety will be entitled are any rights

of the obligee/creditor (*i.e.*, Travelers) to resort to any other security for the bonded obligation. For

example, in *Pep'e v. McCarthy,* 249 A.D.2d 286, 287, 672 N.Y.S.2d 350 (2d Dep't 1998), the court

recognized the surety's subrogation to the rights of the first mortgagee as senior lienholder to the extent

of surety's $750,000 payment under the bond (even though the surety's payment had not constituted

full payment to the creditor). See also *Big Idea Liquidating Creditor Trust v. Safeco Ins. Co. of Am.* (*In re Big Idea Prods.*), 372 B.R. 388 (Bankr. N.D. Ill. 2007) (Bkrtcy.N.D.Ill. 2007) ("A surety who pays a creditor of the principal is subrogated to all of the rights that creditor has to collect the debt from the principal."); *In re Wetzler*, 192 B.R. 109 (1996) (Bkrtcy.D.Md. 1996) ("When a surety satisfies the debt of another, the surety acquires all rights that the original creditor had against the debtor.").

Sureties' rights of "contingent subrogation" and "anticipatory subrogation" are also cognizable, in a variety of contexts. For example, as was observed in *In re Ollag Constr. Equip. Corp.*, 578 F.2d 904 (2d Cir. 1978), "Learned Hand's landmark opinion in *Syracuse Eng'g Co. v. Haight*, 97 F.2d 573, 576 (2d Cir. 1938), taught us that contingent subrogation and contribution rights must be valued as assets in determining solvency." See also *Nat'l Union Fire Ins. Co. v. FDIC*, 887 F. Supp. 262, 264 (D. Kan. 1995); *Allied Mut. Ins. Co. v. Heiken*, 675 N.W.2d 820, 829–30 (Iowa 2004). In *Menorah Nursing Home, Inc. v. Zukov, 153 A.D.2d 13, 17, 548 N.Y.S.2d 702, 705 (2d Dep't 1989)*, the court held:

> Furthermore, Lumbermens does not lack standing to assert its subrogation rights simply because it has not yet been called upon to pay any money pursuant to its bond. While it is true that the remedy of subrogation is generally available to a surety only when the claim of the creditor obligee has been paid (*see generally,* 63 N.Y.Jur.2d, Guarantee and Suretyship, § 435), "[t]he Court of Appeals has already sustained the viability of a contingent third-party claim based on subrogation" [citations omitted].

The whole intent of the Debtor's current Motion is to force the Debtor's obligations to Travelers to be paid out of the proceeds of the surety's Bond, while depriving the surety of equitable subrogation to Travelers' other collateral to which the surety would be subrogated (*i.e.,* the proceeds of the letters of credit). That would be clear error. As was held in *Pep'e v. McCarthy*, 249 A.D.2d 286, 287, 672 N.Y.S.2d 350 (2d Dep't 1998), supra, "'A subrogated claim is not in any way diminished or extinguished by the subrogation. It is merely 'taken over' by another who stands in the place of the original claimant' (*Thomas Goodfellow, Inc. v. Lyons Trans. Lines*, 127 Misc.2d 651, 486 N.Y.S.2d 842)." In this instance, Lumbermens would have been entitled to take over Travelers' position as a

- 38 -

secured and priority claimant, and thus to assert Travelers' rights to the remaining security in the form

of the LOC to the extent that Lumbermens made payment under its Bond.  Accordingly, even had the

Letter Agreement terms of which Ames complains not been included, the result to the Ames estate

would have been the same, as Lumbermens could have looked to the Letters of Credit to make itself

whole for any loss under the Bond.

<u>POINT IV</u>

Ames' Second Amended Complaint Has No Merit
<u>And Its Claims Are Based Upon State Law</u>

In addressing the question of whether it is appropriate to stay or dismiss this Adversary

Proceeding in deference to the Illinois rehabilitation proceedings, the relative lack of merit, on their

face, of Ames' claims against Lumbermens should also be considered.  While this is not a motion for

summary judgment (and, indeed, the Bankruptcy Court has denied the parties' requests to move for

summary judgment), the Court should be aware that Ames' seven "claims" all seek essentially the

same relief, none of which overcomes the defects of its "First Claim" — alleging a "breach of

contract", the contract being the Bond, which itself negates any such claim by Ames by stating, in part,

"<u>The Principal shall not at any time have any rights or property interests in this Bond, the Bond</u>

<u>Collateral or other proceeds of this Bond</u>").

Ames' "First Claim", alleging "breach of contract", refutes itself, since it is well established

that a surety's obligation under its surety bond is owed to the bond "obligee" (*i.e.*, Travelers), not to its

bond "principal" (*i.e.*, Ames).  Furthermore, Ames itself clearly breached its own obligations to

Lumbermens, by failing to fulfill Ames' own obligations to Travelers sufficiently to hold Lumbermens

harmless from Travelers' demand.  Ames thereby violated Ames' obligations to Lumbermens, which

excused any return performance (if any) that might have been due (or that Ames argues was due) from

Lumbermens to Ames.  See *John's Insulation v. Hartford Accident & Indem. Co.* (*In re John's*

*Insulation*), 221 B.R. 683, 688–89 (Bankr. E.D.N.Y. 1998) ("the general rule is that "[a] principal

cannot maintain a suit against his sureties for his own default.""); 63 *N.Y.Jur.2d, Guaranty &
Suretyship* § 494 (1987). *See also Chem. Bank v. Meltzer*, 93 N.Y.2d 296, 302–05 (1999), squarely
rejecting a contention that a guarantor had incurred a primary liability to the "obligor", for the benefit
of the "principal" (despite language in the guaranty stating that the guarantor was liable "jointly and
severally, absolutely, irrevocably and unconditionally", "as a primary obligor and not merely as a
surety").[54]

In addition, there are several further obstacles to any breach of contract claim by Ames, a
bankrupt principal, against Lumbermens, its own surety, for alleged breach of the Bond, which is a
"financial accommodation" under the Bankruptcy Code. Even if the Bond had been some sort of pre-
petition "line of credit" which Ames could access to finance its obligations to Travelers, Ames'
entitlement to enforce it would have been barred by Bankruptcy Code, 11 U.S.C. § 365(c)(1)(B)(2)
(restricting enforcement of financial accommodations post-petition). Furthermore, even if Ames had
the right to "enforce" the Bond (which it does not), and even if the "financial accommodation" rules
did not apply to the Bond, Ames would have had to "assume" the Bond in order to sue Lumbermens
for allegedly "breaching" it, in which event Ames' own breach of its obligations to Lumbermens would
refute its own claim.

Ames has asserted that it has never assumed nor rejected any of its pre-petition agreements
with Travelers or Lumbermens, including the Bond, the Indemnity Agreement and the Place-in-Funds
Letter. Nevertheless, Ames has proposed to reject all contracts that it has not yet assumed, in its
proposed Plan of Liquidation. Even if the agreements were assumable and were assumed, Ames would
be required to cure its own defaults, including under the Indemnity Agreement and the Bond, as the

---

[54] See also *Citizens Bank of Md. v. Strumpf, 516 U.S. 16, 19-21 (1995)* rejecting claims made by a debtor against a bank
which had refused the debtor's request to make payment to a third party from a bank account established for the debtor,
stating in part as follows:

> It would be an odd construction of § 362(a)(7) that required a creditor with a right of setoff to do
> immediately that which § 542(b) specifically excuses it from doing as a general matter:  pay a claim to
> which a defense of setoff applies.

agreements would become "post-petition obligations" on the part of Ames. If the agreements are

rejected, the rejection constitutes a breach of contract by Ames as of the date of its chapter 11 petition

(August 20, 2001), and would excuse Lumbermens' performance under the Bond, thus depriving Ames

its "First Claim" alleging a breach of contract by Lumbermens. See *In re Lyondell Chem. Co.*, 416

B.R. 108, 115 (Bankr. S.D.N.Y. 2009) (Gerber, B.J.) ("rejection excuses future performance under that

contract by the contract counter-party, and deprives the debtor from securing the contract's future

benefits"). Accordingly, regardless of whether the Bond is assumed or rejected, Ames cannot enforce

the Lumbermens Bond, or collect the Bond's proceeds for Ames' benefit, under its alleged "First

Claim" for breach of contract.

Moreover, Ames' alleged "breach of contract" claim is not assisted by the Second Amended

Complaint's incorrect argument, at ¶¶3, 6, 32 and elsewhere, that the Bond is a "pay on demand"

instrument (and that Lumbermens failed to "pay on demand", in quotation marks as though Ames were

quoting from the Bond). Nowhere do the words "pay on demand" appear in the Bond (nor does the

Bond contain any similar words to the same effect).[55]

Ames' "Second Claim" and "Third Claim" allege breach of a duty of "good faith"[56] and

"unjust enrichment",[57] both of which are baseless as a matter of fact and law (and, Lumbermens

---

[55] Ames' contention that Ames and Lumbermens are the only two parties to the Bond is simply wrong. For three thousand years, it has been well established that a surety bond creates a three-party relationship, among the principal, the surety, and the obligee.[55] Indeed, a surety bond is ordinarily not valid or enforceable unless and until it is delivered to and accepted by the named bond obligee. *Rachman Bag v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 238 (2d Cir. 1995); *S.S. Silberblatt, Inc. v. Seaboard Sur. Co.*, 417 F.2d 1043, 1051–52 (8th Cir. 1969); *Beitler v. Rudkin*, 104 Conn. 404, 410 (1926); *Craft v. Isham*, 13 Conn. 28, 41 (1838); see also *Chester v. Leonard*, 68 Conn. 495, 37 A. 397 (1897).

[56] Regarding the futility of Ames' "Second Claim" alleging breach of a duty of good faith, it is well established under Connecticut Law (applicable by the express terms of the Bond) that "an honest mistake, incorrect interpretation or mere difference in the parties' interpretations of a contract does not amount to bad faith conduct without an associated '"dishonest purpose.'"" *19 Perry St., L.L.C. v. Unionville Water Co.*, 294 Conn. 611, 987 A.2d 1009 (2010). *See also Elm Haven Const. LP v. Neri Const.*, 376 F.3d 96 (2d Cir. 2004); *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433, 849 A.2d 382 (2004); *PSE Consulting, Inc.*, 267 Conn. 279, 838 A.2d 135; *Travelers Cas. & Sur. Co. of Am. v. Caridi*, 2012 Conn. Super. LEXIS, supra, at 1083; Crow & Sutton Assocs. v.C.R. Klewin Northeast, *LLC*, 2010 Conn. Super. LEXIS 1197, 39–44 (Conn. Super. Ct. May 21 2010).

[57] Regarding the futility of Ames' "Third Claim" alleging "unjust enrichment", *see, e.g., Greenwich Ins. Co. v. Greenwich St. Capital Partners II, L.P. (In re Metro Affiliates, Inc.)*, 2008 Bankr. LEXIS 752 (Bankr. S.D.N.Y. Mar. 6, 2008) ("Unjust

submits, would be dismissed by way of judgment on the pleadings if the Court were to consider such a

motion, under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

Ames' "Fourth Claim" then contends that Lumbermens violated the automatic stay — by

entering into the Letter Agreement.  As was described above, Ames' allegations of a stay violation are

devoid of substance, and in any event Ames cannot show it suffered any injury or damages, since

Ames itself was liable for all payments due or to become due to Travelers.  Furthermore, Ames cannot

demonstrate that Travelers would have elected to apply the Bond or its proceeds, before calling on and

applying the letters of credit.[58]  Quite the contrary, the record establishes that Travelers elected, when

its signed the Letter Agreement with Lumbermens, to apply the letters of credit first.  Ames' theory of

its "automatic stay violation" claim is purely speculative, as to what might have happened if the events

had developed in the manner Ames now argues, in retrospect, that they should have.[59]

---

[58] enrichment applies only where no express agreement exists.").  See also *Auto Glass Exp., Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 975 A.2d 1266 (2009); *Vertex, Inc. v. Waterbury*, 278 Conn. 557, 573, 898 A.2d 178 (2006).

[58] *In re Fiber Optek Interconnect Corp.*, 2009 Bankr. LEXIS 3040, 14-15 (Bankr. S.D.N.Y. Sept. 23, 2009) ("With regard to violations of the automatic stay in general, "a bankruptcy court may impose sanctions pursuant to § 362(h) . . . only for violating a stay as to debtors who are natural persons. For other debtors, contempt proceedings are the proper means of compensation and punishment for willful violations of the automatic stay." *Mar. Asbestosis Legal Clinic v. LTV Steel Co.* (*In re Chateaugay Corp.*), 920 F.2d 183, 186–87 (2d Cir. 1990) "); *In re Coney Island Land Co., LLC*, 2005 Bankr. LEXIS 2909 at * 14–15 (Bankr. E.D.N.Y. Mar. 31 2005) ("Corporate debtors seeking sanctions may have recourse in the assessment of sanctions in contempt proceedings. In such proceedings, the court must find the presence of malicious intent or the absence of good faith in order to hold a person in contempt for conduct violating the automatic stay.") (emphasis added)

[59] See *Newbery Corp. v. Fireman's Fund Ins. Co.* (*In re Newbery Corp.*), 95 F.3d 1392 (9th Cir. 1996), rejecting claims similar to Ames' alleging, as did Ames, (i) breach of contract, (ii)  violation of any alleged duty of good faith, (iii) unjust enrichment, and (iv) violation of the automatic stay .  Even if this Court were to accept Ames' contention that Ames was entitled to compel Lumbermens to make payment under the Bond (despite that Ames never asked or demanded that Lumbermens do so), Lumbermens would thereupon have been immediately entitled to reimbursement from Ames. Furthermore, under the "Place-in-Funds Letter" Ames had signed, Ames would have been required to "put Lumbermens Mutual Casualty Company in funds prior to any actual payment to satisfy such demand." Gamell Aff. Ex. DD.-  Thus, Lumbermens would have been entitled to recoupment (arising from the same transaction as would have given rise to Ames' own entitlements).  Such right of recoupment was not barred by the automatic stay.  See *Malinowski v. N.Y. State DOL* (*In re Malinowski*), 156 F.3d 131, 133 (2d Cir. 1998) ("The automatic stay is inapplicable, because funds subject to recoupment are not the debtor's property.").  As was held in *In re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. 427, 432 (Bankr. S.D.N.Y. 1982), *aff'd*, 34 B.R. 385 (S.D.N.Y. 1983), "The trustee may not assert the automatic stay as a weapon to obtain the gross benefits under a contract with the defendants and prevent the defendants from netting out against that contract the recoupment called for under the same agreement."  See also *Matter of Holford*, 896 F.2d 176, 179 (5th Cir. 1990).  Cf., *N.Y. State Elec. & Gas Corp. v. McMahon* (*In re McMahon*), 129 F.3d 93, 96 (2d Cir. 1997) ("While a 'setoff' is subject to the automatic stay provision of 11 U.S.C. § 362, a recoupment is not.").  The Ninth Circuit held in *Newbery Corporation v. Fireman's Fund Ins. Co.* (*In re Newbery Corp.*), *supra*, that recoupment does not violate "the bankruptcy principle of ratable distribution of assets among creditors" (*Newbery Corp.*, 95 F.3d at 1400, citing *Ashland Petrol. Co. v. Appel* (*In re B & L*

Ames' "Fifth Claim" contends Ames is entitled to enforce a clause in the "Letter Agreement" in which Travelers and Lumbermens settled Travelers' Bond claim — despite that Ames itself also argues that the Letter Agreement is void, is unenforceable, and is not binding as between Lumbermens and Ames, since Ames did not sign it. This "claim," as was discussed above, is simply baseless and relies upon a mis-characterization of the language of the Letter Agreement.

Ames "Sixth Claim" seeks "marshalling" (the rules for which simply do not apply to these facts, under the established precedents),[60] along with an alternative theory Ames has called "Targeted Use of Assets Collateralizing Obligations" (for which Ames offers no precedent or other authoritative support, and which not even "Google" recognizes in a bankruptcy context). In other words, Ames' "Sixth Claim" sets forth nothing more than Ames' own "novel", "creative" effort to get the Bankruptcy Court to do that which will bring funds into the Ames estate, and which would violate the directives of the Second Circuit setting limits upon the bankruptcy courts' authority. See, e.g., *In re Smart World Techs., L.L.C.*, 423 F.3d 166, 183–84 (2d Cir. 2005); *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005); and *New Eng. Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 91–92 (2d Cir. 2003).

Ames' "seventh" claim relating to the Travelers Bond seeks "equitable subordination" of Lumbermens' bankruptcy claim based upon the facts alleged in Ames' prior "claims", accusing Lumbermens of inequitable conduct. As Ames' "equitable subordination" claim depends upon its prior claim allegations, it is equally as deficient as are those alleged "claims".

Thus, Ames' entire pleading entirely lacks merit.

---

*Oil Co.*), 782 F.2d 155, 157 (10th Cir. 1986) ("when the creditor's claim arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation").

[60] See, e.g., *Meyer v. United States*, 375 U.S. 233, 236–37 (1963); *Peoples State Bank v. GE Capital Corp. (In re Ark-La-Tex Timber Co.)*, 482 F.3d 319, 331 (5th Cir. 2007); *Galey & Lord Inc. v. Arley Corp. (In re Arlco, Inc.)*, 239 B.R. 261, 274 (S.D.N.Y. 1999); *Vt. Toy Works, Inc. v. Sebert Lumber Co. (In re Vt. Toy Works, Inc.)*, 135 B.R. 762 (D. Vt. 1991); *Transmontaigne Prod. Servs. v. M/V Wilbur R. Clark, supra, 2010 U.S. Dist. LEXIS* 30, 197, 33–34 (S.D. Ala. Mar. 29 2010).

## POINT V

## Ames' Other Jurisdictional Arguments Are Without Merit

Ames erroneously argues that the proofs of claim that Lumbermens filed in the Ames

bankruptcy proceedings require that all aspects of this Adversary Proceeding remain with the

Bankruptcy Court.  However, as is plain from the discussion above of Ames' Adversary Complaint,

Ames' claims against Lumbermens are not essentially counterclaims to Lumberemns claims in the

bankruptcy proceedings (which essentially seek a general unsecured claim for Lumbermens' losses and

expenses under the Indemnity Agreement).

In addition, Ames' references to Lumbermens' administrative claim in the bankruptcy is

misleading, as it is clear that the administrative claim was only asserted defensively, as a result of

Ames' insistence in arguing that the pre-petition Lumbermens Bond could be used to secure an entirely

post-petition insurance agreement between Ames and Travelers, without Lumbermens consent and

without attempting to "assume" the Bond and Indemnity Agreement. Lumbermens' position in this

respect is that so long as Ames maintains that the Bond should have responded for post-petition,

administrative payments by Ames to Travelers under an entirely post-petition agreement, then

Lumbermens is entitled to maintain an administrative claim for all of the premiums due for the Bond

during the post-petition period, as well as potentially for any and all post-petition period losses or

expenses of Lumbermens.

Accordingly, Lumbermens' proofs of claim in the bankruptcy proceedings do not themselves

render Ames' adversary proceeding a "core" proceeding.  As the District Court stated in *Hirsch*, 198

B.R. at 50 n.7 (Sotomayor, J.):

> Similarly, Travelers' proof of claim against the estate does not render this matter core.  A
> debtor's adversary proceeding against a creditor is a core matter only when it arises out of
> the same transaction as the proof of claim -- functioning, in essence, as a counterclaim to it.
> *See Katchen v. Landy*, 382 U.S. 323, 15 L. Ed. 2d 391, 86 S. Ct. 467 (1966) (bankruptcy
> court has jurisdiction to decide debtor's counterclaims against creditor when counterclaims
> arise out of "same transaction" as creditor's proof of claim); *In re S.G. Phillips*

*Constructors, Inc.*, 45 F.3d 702, 705 (2d Cir. 1995) (adversary proceeding is core when it raises objection to creditor's proof of claim); *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1389-90 (2d Cir. 1990) (same). Here, the Trustee does not contest Travelers' proof of claim, which stems from Seatrain's previous bankruptcy case under Chapter 11 and relates to a stipulated amount of unpaid insurance premiums. The instant adversary proceeding raises unrelated issues concerning the scope of coverage and thus cannot be construed as a counterclaim to Travelers' proof of claim.

<u>CONCLUSION</u>

Ames' Jurisdiction Motion must be denied, and this Adversary Proceeding must be dismissed

or stayed in deference to the Illinois state rehabilitation proceedings.


Dated:   Jericho, New York
         December 28, 2012


Respectfully Submitted,

TORRE, LENTZ, GAMELL, GARY
   & RITTMASTER, LLP
*Attorneys for Defendant*

By:   ___/s/  *Mark S. Gamell*___
         Mark S. Gamell
         Robert Beau Leonard
100 Jericho Quadrangle, Suite 309
Jericho, NY 11753-2702
Tel.: (516) 240-8900
Email: mgamell@tlggr.com